*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WATSON/WILSON, Minors.

UNPUBLISHED
February 27, 2020

No. 349138; 349139; 349847
Wayne Circuit Court
Family Division
LC No. 16-522445-NA

Before: SHAPIRO, P.J., and JANSEN and M. J. KELLY, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother appeals as of right the trial court's orders terminating her parental rights to LW, TW, DW, JW, HW, and SW under MCL 712A.19b(3)(g), and respondent-father appeals as of right the trial court order terminating his parental rights to LW, TW, and DW under MCL 712A.19b(3)(g).[2] We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

The child protective proceedings in this case began in March 2016, after respondents' one-year old child, DW, was taken to the hospital with a broken arm. Initially, respondent-mother claimed the injury was caused by DW falling from her crib, but she eventually admitted that was not true and that she did not know how the injury occurred. Respondent-father denied knowing how the injury occurred. Petitioner, the Department of Health and Human Services (DHHS), filed a petition seeking termination of respondents' parental rights to LW, TW, DW, and JW.

---

[1] *In re Watson/Wilson Minors*, unpublished order of the Court of Appeals, entered July 25, 2019 (Docket Nos. 349138, 349139, and 349847).

[2] The trial court also terminated the parental rights of JW's father and of the unknown fathers of HW and SW. No appeal is pending from those termination decisions.

-1-

Respondents pleaded to jurisdiction, but following a termination hearing the court did not find statutory grounds to terminate their parental rights. The permanency goal was changed to reunification, and respondents were provided with services to address the barriers to reunification. Respondent-mother also gave birth to two additional children: JW and HW. The court assumed jurisdiction over JW in January 2017, and respondent continued to be provided with services aimed at reunifying her with all of the children. Respondent-father also continued to be offered services. However, throughout the case, respondents were largely noncompliant with their parent-agency agreements (PAAs), and their caseworkers opined that they derived no benefit from the portions of the agreement that they had completed. As a result, the DHHS sought termination of respondents' parental rights to their respective children.

Following a termination hearing, the court found that there was clear and convincing evidence to terminate respondents' parental rights under MCL 712A.19b(3)(g), and it found that termination of their parental rights was in the children's best interests. The court found that DHHS had complied with its duty to provide reasonable efforts to reunify respondents with their respective children in accordance with the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*. Respondents' appeals in Docket Nos. 349138 and 349139 follow from this order.

Shortly after her parental rights were terminated, respondent-mother gave birth to a sixth child, SW. Respondent-mother was interviewed at the hospital, and she explained that she was homeless, did not have an income, and had rejected treatment for her cognitive impairment. Thereafter, the DHHS filed a petition seeking termination of respondent-mother's parental rights to SW. And, after a combined adjudication trial and termination hearing, the court found statutory grounds to assume jurisdiction over SW, that termination of respondent's parental rights to SW was warranted under MCL 712A.19b(3)(g), and that termination of respondent-mother's parental rights was in SW's best interests. Accordingly, it entered an order terminating respondent-mother's parental rights, which she appeals by right in Docket No. 349847.

## II. REUNIFICATION EFFORTS

### A. STANDARD OF REVIEW

Respondents argue that the trial court clearly erred by finding that the DHHS complied with its statutory duty to provide ADA-compliant reasonable efforts toward reunification. This Court reviews for clear error a trial court's finding that "reasonable efforts were made to preserve and reunify the family." *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). A trial court clearly errs when "we are definitely and firmly convinced that it made a mistake." *In re White*, 303 Mich App 701, 709-710; 846 NW2d 61 (2014).

### B. ANALYSIS

Generally, "[u]nder Michigan's Probate Code, [the DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re*

*Hicks/Brown Minors*, 500 Mich 79, 85; 893 NW2d 637 (2017).[3] "As part of these reasonable efforts, [the DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id.* at 85-86. In this case, respondents were provided with a case services plan outlining the barriers to reunification and the services that would be provided to them to rectify the conditions leading to court involvement. Under their respective PAAs, respondents were required to participate in parenting classes, individual counseling, domestic-violence counseling (with an anger management component for respondent-father), and submit to psychological evaluations. In addition, they were to visit the children consistently and maintain a suitable residence and income.

Although reunification services were offered, respondents argue that the DHHS failed in its duty under the ADA to provide reasonable accommodations in light of their cognitive impairments. The DHHS "must comply with the ADA" when it is establishing a plan for reunification services. *In re Terry*, 240 Mich App 14, 25; 610 NW2d 563 (2000). "Title II of the ADA requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *In re Hicks/Brown*, 500 Mich at 86 (quotation marks and citation omitted). Thus, the DHHS "must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability" unless such modifications would fundamentally alter the services provided. *Id.* (quotation marks and citation omitted). When the DHHS fails to do so, it "fail[s] in its duty to make reasonable efforts at reunification under MCL 712A.19a(2)." *Id.*

At the time the PAA's were entered in September 2016, the caseworker indicated that, depending on the results of the psychological evaluations, specialized parenting classes might be required. In December 2016, at the next dispositional hearing, the caseworker reported that respondent-father had submitted to his psychological evaluation. The evaluation indicated that he needed parenting classes and individual therapy, both of which were already being provided. Further, because of respondent-father's cognitive deficits, he was going to be referred for Neighborhood Service Organization (NSO) services. With regard to respondent-mother, the caseworker stated that she had missed her appointment for the psychological evaluation and had to be re-referred. Because of their cognitive issues, the court ordered parent partners for respondents. Finally, the court explained that once respondent-mother's psychological evaluation was completed the need for more services could be addressed.

By March 2017, respondent-mother had still not completed the psychological evaluation. And, although respondent-father was not yet receiving the ordered NSO services, the caseworker explained that she was unable to refer him to the program because he had to personally apply.

---

[3] In *In re Moss*, 301 Mich App 76, 90-91; 836 NW2d 182 (2013), this Court held that the DHHS is not required to make reasonable reunification efforts if it seeks termination of the respondent-parents' parental rights at the initial disposition. In addition, reunification efforts are not required if there are aggravating circumstances, such as those enumerated in MCL 712A.19a(2).

She stated that he needed to come to the office so that she could help him set up the service. Neither respondent had received a referral for a parent partner at that time. In light of the delay in services, the court set a review hearing for 45 to 60 days instead of the typical 90 days between hearings. The shortened review time was an accommodation offered to respondents in light of respondent-father's diagnosed disability and respondent-mother's perceived disability.

The next review hearing occurred in May 2017. Respondent-mother had still not completed her psychological evaluation, was not in compliance with her parenting classes, and had been terminated from the parent-partner program based on her failure to keep in contact with her parent partner. Respondent-mother was referred to a supportive-visitation program. As part of that program, a parenting specialist would observe parenting-time visits, provide feedback and corrections during or after the visits, and help respondent-mother learn appropriate parenting skills. She was, however, terminated from that program because she refused to participate and told the specialist that she did not need the program. On questioning from the court, the caseworker explained that until respondent-mother submitted to the psychological evaluation, the DHHS's ability to tailor services to her perceived cognitive impairment was limited. Yet, she also stated that respondent-mother would be re-referred to the parent-partner program.

Respondent-father also made minimal progress during the reporting period. He was terminated from his parenting classes, had to be re-referred for domestic-violence counseling, had been terminated from the parent-partner program for noncompliance, and was only partially compliant with parenting time. Respondent-father was still not receiving NSO services, but the caseworker explained that he still had not come to the office so that they could aid him in setting up that service. The caseworker indicated that she planned to re-refer respondent-father to the parent-partner program. At the end of the hearing, concerned that respondents may need additional services because of their cognitive impairments, the court sua sponte ordered that respondents be provided with a court appointed special advocate (CASA) to try and help them engage in the offered services.

At the July 2017 review hearing, respondent-mother had still not completed her psychological evaluation, and, although she completed her domestic-violence therapy, she was otherwise noncompliant with the rest of her PAA. Respondent-father was also not in compliance with his PAA, and the court ordered him to stay in contact with his caseworker so that the services for his cognitive impairment could be secured.

In October 2017 little progress had been made. Respondent-mother had been again terminated from her parenting classes, was about to be terminated from her individual therapy, had still not submitted to the ordered psychological evaluation, and attended 5 out of 12 offered parenting-time visits. Her caseworker reported that at each of the parenting-time visits, she spoke with respondent-mother and provided her with information on how to obtain all the services being offered, but respondent-mother did not taken advantage of the services. Respondent-father completed his parenting classes, but was unable to demonstrate any benefit. He attended 1 of the 12 offered parenting-time visits. He was terminated from his domestic-violence counseling and individual therapy. At the conclusion of the hearing, the court ordered that respondent-mother receive any services that the DHHS felt necessary, even in the absence of her psychological evaluation.

By the December 2017 review hearing, respondent-mother had finally completed her psychological evaluation. She was diagnosed with a cognitive impairment, and the DHHS indicated that she would be re-referred to a parent partner. Although respondent-mother was offered other services between October 2017 and December 2017, the psychological evaluation was the only service she completed. Respondent-father was similarly noncompliant with his PAA. He had been re-referred for individual counseling, but when his counselor had tried to assist him with housing and obtaining a developmental-delay evaluation, respondent-father became angry and stormed out of the office. The parents' CASA indicated that the DHHS was doing everything it could, but that respondents were not engaging in services.

In March 2018, the lack of progress continued. Respondent-mother had been referred to a new parent partner, but she was not engaging with the partner or following the partner's recommendations. She still did not have housing or income, had not completed individual therapy, had not completed parenting classes (which she had been referred to six times), and only attended 7 out of 15 offered parenting-time visits. Respondent-father had been twice terminated and re-enrolled in individual counseling, had still not completed domestic-violence counseling or parenting classes, lacked housing, and participated in fewer than half of the offered parenting-time visits. At the end of the review hearing, respondents argued that the DHHS was not making reasonable efforts to reunite them with their children, but the court found that the DHHS was doing all that it could and respondents were not fulfilling their concomitant duty to take advantage of the services offered. The court again ordered a shortened review period, but between the March 2018 hearing and the April 2018 hearing, no significant changes occurred.

In June 2018, the caseworker reported that respondent-mother had participated in a psychiatric evaluation, which recommended that she engage in individual trauma-based therapy. Respondent-mother, however, was terminated from her therapy based on her lack of participation. As for respondent-father, he reported that he was married and living with his wife. He still had not completed domestic-violence therapy or individual therapy. Thereafter, the DHHS sought termination of respondents' parental rights.

On appeal, respondents contend that more should have been done to accommodate their cognitive impairments. But, as is plain from the record, offering more services to accommodate respondents would have yielded little gain. From 2016 until 2019, respondents were provided with numerous services, including services ordered as an accommodation for their cognitive impairments. They largely failed to take advantage of the services.

For respondent-mother, the record reflects that her repeated failure to attend the psychological evaluation resulted in a delay in receiving specialized services. Although the DHHS has a duty to provide ADA-compliant services, respondent parents have a duty to "participate or demonstrate that they sufficiently benefited from the services provided." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Moreover, even without a psychological evaluation, respondent-mother was referred to a parent partner, was offered a supportive-visitation specialist, and the court appointed a CASA to aid her in engaging in reunification services. She did not, however, engage with the parent partner and was terminated. Further, she rejected the supportive-visitation specialist. After being re-referred to the parent-partner program, she was terminated for lack of participation. In this case, we conclude that the trial

court did not clearly err by finding that the DHHS made reasonable efforts to reunify respondent-mother with her children and that those efforts were compliant with the ADA.

As to respondent-father, it was determined early in the case that he had a cognitive impairment. Specialized services were ordered and it was repeatedly stated that, to avail himself of those services, he had to apply himself. The DHHS repeatedly stated that it would assist with that process, but respondent-father did not participate. Further, although respondent-father was provided with a parent partner, his failure to engage resulted in his termination from that program. Likewise, although he was provided with parenting classes, domestic-violence therapy, and individual therapy he either did not participate or did not benefit from his participation. Based on the record, the court did not clearly err by finding that the DHHS made reasonable efforts to reunify respondent-father with his children and that those efforts were compliant with the ADA.

## III. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

Respondents argue that the trial court clearly erred by finding clear and convincing evidence to terminate their parental rights under MCL 712A.19b(3)(g). "This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *White*, 303 Mich App at 709.

### B. ANALYSIS

The trial court terminated respondents' parental rights under MCL 712A.19b(3)(g), which allows for termination if the court finds by clear and convincing evidence that "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age."

"A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *White*, 303 Mich App at 710. As is detailed above, respondents failed to fully participate in and benefit from the PAAs. Respondent-mother was terminated from the parent-partner program on two occasions. She was inconsistent in attending parenting time. After a number of re-referrals to parenting classes, respondent-mother finally completed them, but she was unable to demonstrate a benefit. During visits, she was unable to focus on more than one child at a time. She also was observed bouncing HW, whose head needed to be stabilized because he had been born with water on his brain, and giving another child food without regard to his known allergy. In both cases, the DHHS staff intervened to avoid harm to the children and attempted to explain the problem to respondent. Respondent-mother was disinterested in how to avoid the dangers posed by her behavior. This disregard for the children was also exhibited through her giving Skittles to a baby and leaving the younger children unattended for long periods of time. Respondent-mother also

-6-

overextended SW's joints during an attempted exercise. Further, respondent-mother was unable to obtain housing and appeared to be homeless at the time of the termination hearing.[4] Respondent-mother had untreated cognitive deficits, which inhibited her parenting ability. Despite those impairments, respondent-mother was repeatedly terminated from individual counseling during the course of the case. Further, during the termination hearing of SW, respondent-mother acknowledged that she had abandoned any form of treatment for her mental issues. She was not seeing a doctor or engaging in counseling, and she had decided to stop taking her prescribed medication. Given the length of time that services had been provided to rectify the issues, and respondent-mother's lack of progress, the trial court did not err by finding that she would be unable to remedy any or all of those problems within a reasonable time. Termination was proper under MCL 712A.19b(3)(g).

We also discern no error in the court's decision to terminate respondent-father's parental rights under MCL 712A.19b(3)(g). At the time of the termination hearing, respondent-father was in jail and planned to get divorced when he got out. Nothing on the record supports that he would have a place to live upon release from jail.[5] Respondent-father had untreated mental health issues, and the record reflects that he had a domestic-violence felony conviction in 2013 and had been accused of domestic violence by his wife, who had recently obtained a personal protection order against him. Respondent-father also had issues with anger. He was removed from services or refused to engage in services because of his anger, but rather than engage in services to remedy the issue he refused to engage in weekly counseling or in any domestic-violence counseling. Respondent-father's history of domestic violence and untreated anger issues are troubling because the children entered DHHS's care because DW went to the hospital after her arm was broken while in his care. The doctors believed the injury to be non-accidental. Respondent-father also exhibited problems with parenting ability. He failed to visit the children on a regular basis. When respondent-father would come to visits, he wanted to spend a significant amount of time discussing his case with the DHHS caseworker supervising the parenting time. If the worker attempted to redirect respondent-father and suggest he focus on his children, he would refuse or become belligerently angry and be required to leave. The DHHS attempted to provide services which would have helped respondent-father with his parenting issues. However, respondent-father refused to participate. Based on this record, the trial court did not clearly err by terminating his parental rights under MCL 712A.19b(3)(g).

---

[4] We note that respondent-mother's homelessness was not because of financial problems; she had been on the verge of receiving governmental assistance via an affordable-housing voucher before she stopped participating with the parent partner. In addition, respondent-mother failed to complete her application for social-security income.

[5] We note that respondent-father's housing issues were not caused by a of a lack of income. Respondent-father received social-security income throughout the proceedings.

## IV. BEST INTERESTS

## A. STANDARD OF REVIEW

Respondents contend that the trial court clearly erred in finding that it was in the children's best interests to terminate their parental rights. This Court reviews a trial court's determination regarding best interests for clear error. *White*, 303 Mich App at 713.

## B. ANALYSIS

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014). "The focus at the best-interest stage has always been on the child, not the parent." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks and citation omitted). The court can consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. at 63-64. The court can also consider "the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan." *Id*. at 64 (quotation marks and citations omitted). "[T]he fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interest." *In re Olive/Metts Minors*, 297 Mich App 35, 43; 823 NW2d 144 (2012) (quotation marks and citation omitted).

Respondents argue that the trial court failed to give appropriate weight to the fact that they loved and were bonded with the children. However, the existence of a bond between respondents and their children is a factor that was considered by the court, but it was not the only relevant factor in this case. Four of the children had been in care since 2016. Respondents were offered extensive services, which they barely engaged in and did not benefit from. Respondents did not have a place to live, were unable to demonstrate appropriate parenting skills, and had untreated mental health concerns. Respondent-mother had trouble discerning what was appropriate and safe for her children, and respondent-father showed an inability to control his anger.

Respondent-mother contends that a guardianship might have been appropriate or that the children could have been allowed to remain in a relative placement. Similarly, respondent-father asserts that there were family members willing to care for the children on a long-term basis. Yet, the children were placed with families who gave them appropriate and consistent care. DW was placed with a maternal relative and the other children were placed with foster families. The foster families and the maternal relative were prepared to adopt the children, and the DHHS foster care worker testified that a guardianship or long-term placement with a relative would not be appropriate because of the infinitesimal chance that reunification would occur. Thus, allowing respondents to be in their children's lives without the possibility of reunification would hinder the children's need for a sense of safety, permanency, and stability. Similarly, allowing more time for respondents to comply with services would be detrimental to the children, especially in light of the dismal progress respondents made between 2016 and 2019. Finally, as

to HW and SW, the record reflects that they were medically fragile and needed specialized care, which the foster parents were providing. In light of the entire record, we conclude that the trial court did not err by finding termination of respondents' parental rights was in the children's best interests.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Kathleen Jansen
/s/ Michael J. Kelly