*In re* LAFRANCE MINORS

Docket Nos. 319219 and 319222. Submitted June 3, 2014, at Grand Rapids. Decided September 23, 2014, at 9:20 a.m.

The Department of Human Services petitioned the Mecosta Circuit Court, Family Division, to terminate the parental rights of the mother and father of four minor children after the youngest child, an infant, was hospitalized for dehydration that resulted in severe but temporary kidney damage. Evidence indicated that the infant had gone without liquid for approximately 16 hours while in her father's care. The mother, who had tested positive for illegal drugs while pregnant, had agreed with Child Protective Services shortly after the child was born to see the infant only with supervision. The petition did not allege any abuse or neglect in connection with the older three children. The court, Marco S. Menezes, J., terminated the parental rights of both parents with respect to all four children, ruling that grounds for doing so had been established under MCL 712A.19b(3)(b)(*ii*) (child or sibling suffered physical injury or abuse that the parent could have prevented), (c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood child will be harmed if returned to the parent). In Docket No. 319219, the mother appealed this decision; the father appealed separately in Docket No. 319222; and the Court of Appeals consolidated the cases.

The Court of Appeals *held*:

1. The court erred as a matter of law by concluding that the medical neglect involved in this case constituted failure to prevent physical harm for purposes of MCL 712A.19b(3)(b)(*ii*). Reading MCL 712A.19b(3)(b)(*ii*) in the context of MCL 712A.19b(3)(b)(*i*) and (*iii*) under the doctrine of *noscitur a sociis* indicated that, for a physical injury to fall within MCL 712A.19b(3), it must have been caused by the act of a parent or nonparent adult and not merely contributed to by an unintentional omission.

2. The trial court did not err by concluding that termination of respondents' parental rights was warranted with respect to the youngest child under MCL 712A.19b(3)(c)(i), (3)(g), and (3)(j);

however, it erred by extending its reasoning to the three older children on a theory of anticipatory neglect.

3. It was not necessary to review the court's best-interest determinations with regard to the three older children because none of the statutory bases for termination were proved with regard to them. However, because the decision was expected to result in the return of the three oldest children to respondents, which would significantly change the family dynamics from those the trial court envisioned when making its original decision, the case was remanded to the trial court to determine anew whether termination of respondents' parental rights to the youngest child was in the child's best interests.

Affirmed in part, reversed in part, and remanded for further proceedings.

TERMINATION OF PARENTAL RIGHTS — GROUNDS FOR TERMINATION — PHYSICAL INJURY OR ABUSE — UNINTENTIONAL ACTS OR OMISSIONS.

MCL 712A.19b(3)(b)(*ii*) authorizes termination of a person's parental rights if a child or a sibling of the child suffered physical injury or physical abuse or sexual abuse if the parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and there was a reasonable likelihood that the child would suffer injury or abuse in the foreseeable future if placed in the parent's home; for a physical injury to fall within MCL 712A.19b(3)(b)(*ii*), it must have been caused by the act of a parent or nonparent adult and not merely contributed to by an unintentional omission.

*Margaret C. Van Black* for appellant in Docket No. 319219.

*Susan Haut* for appellant in Docket No. 319222.

*Samuels Law Office* (by *Erin Barnhart*) for the minors in Docket Nos. 319219 and 319222.

Before: MURPHY, C.J., and SHAPIRO and RIORDAN, JJ.

SHAPIRO, J. In these consolidated cases, respondents, parents of four minor children, appeal as of right the order of the family division of the circuit court terminating their parental rights. We reverse as regards the

three older children and remand this case to the trial court for redetermination of the youngest child's best interests in light of our decision.[1]

## I. FACTS

The children involved in this case are the issue of a 10-year relationship between respondents, who never married. The petition asking the court to take jurisdiction arose from allegations that respondent-father negligently failed to recognize that the youngest child, then only several weeks old and ill with a virus, was becoming dangerously dehydrated, and as a result suffered severe, albeit temporary, kidney damage, and had to be admitted to the hospital for intensive treatment. The petition did not allege any abuse or neglect in connection with the older three children, then aged three, five, and ten years, nor has any abuse or neglect of the three older children ever been alleged anywhere in the course of these proceedings.

While pregnant with the youngest child, respondent-mother tested positive for methadone and THC, and admitted using opiates for years. At birth, in late July 2011, the child tested positive for THC. In light of respondent-mother's drug use, along with some observations of questionable behavior while in the hospital, social workers at the hospital were concerned for her ability to care for the newborn and so contacted Child Protective Services (CPS). Three days after the child's birth, CPS initiated a child protection case. That case did not result in any court action, and so that file is not available to us. However, the parties indicate that respondent-mother agreed to move out of the family

---

[1] We are deciding this case without the benefit of any briefing from petitioner, although the children's lawyer-guardian ad litem (L-GAL) submitted briefs in support of petitioner's position.

home for some time and to see the infant only with supervision. The record before us does not suggest that the agreement between respondent-mother and CPS limited her access to the three older children.

As noted earlier, several weeks later while in the care of respondent-father, the infant became severely dehydrated and required emergency hospitalization. According to the medical records contained in the court file and subsequently provided testimony, the child had been ill for some time with a virus[2] and was listless when she awoke on the morning in question. Respondent father failed to recognize the severity and speed of the infant's deterioration and regarded her as having gone back to sleep when she may in fact have been losing consciousness. He stated that he attempted to give her a bottle, but that she drank nothing from it. He left for work in the early afternoon, upon which his mother took over as babysitter. After an hour or two, the grandmother became concerned that she was unable to rouse the child, and so called 911. Emergency responders stabilized the child and took her to the hospital, where she was diagnosed as suffering from severe dehydration with resulting acute kidney failure, and placed in intensive care. It was estimated that she had gone without liquid intake for approximately 16 hours. Fortunately the child was successfully rehydrated and over several days recovered completely.

Upon admission of the child to the hospital, the case was flagged by the medical staff as possibly involving medical neglect or even physical abuse. The latter was initially a concern because imaging studies revealed that the child had chronic subdural hematomas. Fur-

---

[2] The medical records show that respondent-father brought the child to the emergency room with viral symptoms three weeks earlier.

ther medical examination ruled out that the hematomas were caused by external trauma, but that fact was not immediately known.[3]

Given the suspicious circumstances, and the infant's critical medical condition, the Department of Human Services immediately sought and obtained emergency removal of all four children from respondents' care the following day, November 17, 2011. The petition contained allegations concerning respondent-mother's prenatal drug use as well as the events concerning the infant's emergency hospitalization. Though the other three children were not mentioned in any factual allegations, petitioner requested their emergency removal as well, stating, "the Department feels that the children are at imminent risk of further harm if they are to return to the home of their mother or their father."

On November 30, 2011, petitioner filed an amended petition adding allegations concerning the infant's kidney damage and the discovery of subdural hematomas, which, as noted, raised concerns about physical abuse until further investigation ruled that out. At the preliminary hearing, which was held the next day, the court noted that the other three children "have been raised by the two parents and they seem to be fine right now." The CPS worker agreed that there was no history of medical neglect by the father before the November 2011 incident, and that there was "no allegation regarding the three older children that any of those children were neglected in any way[.]" She also agreed that "all [three older] children appear to be happy and healthy and

---

[3] In a December 15, 2011 letter to CPS, the hospital's child-abuse pediatrician opined that the records of the infant's neonatal care following premature birth indicated a very small head circumference, and that a "diagnosis of diffuse atrophy is more likely as opposed to trauma." Subsequently, the child was diagnosed with mild cerebral palsy, but that condition was neither a cause nor an effect of the dehydration incident.

they've been described as polite and well-behaved," that they "are all very bonded to their parents," and that they "are adamant that they want to see their parents[.]" The children's lawyer-guardian ad litem stated that she had met with "the three older children and . . . all they ask about is when they can see mom, when can they see dad. They're clearly very bonded to both of their parents. . . . [A]ll three of the older children are very well-mannered, very appropriate for their ages; very smart kids, very lovely children." She recommended that the parents be allowed to see the children as often as possible.

The court issued an order finding probable cause to believe that the "conditions of custody in the home and with the individual with whom the children reside are not adequate to safeguard the children from the risk of harm to the children's life, physical health and mental well-being."

A pretrial hearing was held on January 19, 2012, two months after the children's removal. The foster care worker testified that the placement of the three older children was appropriate, and that, although she had no objection to increased supervised visitation, it might be difficult to achieve because of the limited availability of supervision. She recommended that the children remain in their placements.

The foster care worker further testified that she was unaware of "any reason to believe whatsoever that any of the three older children have ever been abused or neglected by [respondent-father]," adding that respondent-father had been completely compliant with services and that his drug screens were all negative. She also testified that the medical concerns regarding the infant were the only reasons for removal, and agreed that the three older children had "been well-parented up to this time." Even

so, the foster care worker opined that respondents would benefit from parenting classes, and stated that she opposed any return of the children to their home until the parents demonstrated additional compliance with the initial service plan. She continued that she would "consider" unsupervised visitation for the older children if the drug screens stayed negative, but expressed the concern that especially respondent-mother might be continuing her problematic drug usage.

After this testimony, counsel for respondent-father addressed the court:

> I feel that the three older children should be returned to Mr. LaFrance's custody, if not now, then in the very near future. . . .
>
> . . . There is not [an] allegation, no evidence, no claim whatsoever that the . . . older children were abused or neglected in any way. . . . [They] are bonded with their father. They enjoy being with their father and it's in their interest as well as Mr. LaFrance's interest for them to be reunited with their father.

Respondent-mother's counsel similarly stated that this was a case of "a very special needs child and the others have been well-cared for." The L-GAL opposed the request, noting that respondent-mother had moved back in with the respondent-father, and that, unlike respondent-father, she continued to test positive for drugs and had not complied with services.

The trial court stated that, although it could not order compliance with services until the court acquired jurisdiction through an adjudication, the more the parents complied with, and benefited from, services, "the sooner they'll be reunified with their children," and that absent such progress it was "unlikely that they'll be returned . . . until and unless there is a finding that the Court does not have jurisdiction." The

court left placement and parenting time to the discretion of petitioner, but stated, "[t]hat's not to say that the parent/child relationship shouldn't be maintained and strengthened . . . to the extent that's possible by providing . . . liberal parenting time and I would recommend that to the Department[.]"

The case was adjudicated on February 17, 2012, when the prosecuting authority advised the court that respondent-father would plead to the allegations that he failed to get his infant daughter timely medical attention on November 17, 2011. Respondent-father did so, and the court took jurisdiction over all four children on the sole statutory ground that there had been a "failure to provide, when able to do so, support, education, medical, surgical, or other necessary care for health or morals." There was no separate adjudication in connection with respondent-mother,[4] but both were ordered to participate in services, and were allowed only supervised visitation at petitioner's discretion.

Through the course of the case, respondents were compliant with some, but not all, services, with respondent-mother being less compliant than respondent-father. The primary area of noncompliance concerned the drug testing and the goal of ending respondents' respective drug dependencies.[5] A second-

---

[4] Respondent-mother complains in general terms about the trial court's having imposed services on her when her parental fitness was never adjudicated, even as she concedes that she had already consented to adhere to petitioner's requirements during her pregnancy. In any event, because she did not argue in her brief on appeal that the lack of a separate adjudication in connection with her was itself grounds for relief, and has not sought to supplement her brief in order to urge retroactive application of our Supreme Court's recent overruling of the one-parent doctrine in *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014), we do not address those issues.

[5] During much, but not all, of the relevant time period, respondents tested positive variously for THC and opiates—particularly hydrocodone,

ary area of concern arose from the youngest child's mild cerebral palsy,[6] which was diagnosed while she was in foster care. Specifically, respondents failed to take advantage of services offered to help them learn to address that child's resulting special needs. Despite being encouraged to attend the child's many medical appointments, respondents missed the great majority of them.

At the same time, the evidence consistently indicated that when respondents had parenting time with the children it went very well, that respondents behaved appropriately and showed no signs of drug-induced impairment, and that it was apparent that strong bonds existed between respondents and the three older children, who ardently wished to be reunited with their parents.

Petitioner sought termination of respondents' parental rights on May 22, 2013, alleging four statutory grounds. The court conducted a two-day evidentiary hearing on the petition, then concluded that each of the four statutory grounds had been demonstrated by clear and convincing evidence and that termination was in the children's best interests. Accordingly, the court entered an order terminating the parental rights of both respondents.

## II. LEGAL ANALYSIS

The trial court concluded that termination of respondents' parental rights was warranted under

---

a derivative of codeine. It appears that for at least some of the period, at least respondent-father had a prescription for hydrocodone and was testing for that substance within therapeutic levels. However, in time, he continued to use the drug without a prescription. Respondent-mother refused to participate in a detoxification program or an inpatient substance-abuse program and regularly tested positive for opiates. While respondent-father participated in both programs, he does not appear to have successfully conquered his dependency.

[6] As noted, this condition was not a result of the dehydration incident.

MCL 712A.19b(3)(b)(*ii*), (c)(*i*), (g), and (j). Those provisions authorize termination under the following circumstances:

(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

* * *

(*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

"If the court finds that there are grounds for termination of parental rights and that termination of parental

rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5).

An appellate court "review[s] for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and . . . the court's decision regarding the child's best interest." *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). A reviewing court must defer to the special ability of the trial court to judge the credibility of witnesses. *Id*. Statutory interpretation, however, is a question of law calling for review de novo. *Thompson v Thompson*, 261 Mich App 353, 358; 683 NW2d 250 (2004).

Parents have a fundamental liberty interest in the "companionship, care, custody, and management of their children." *In re Brock*, 442 Mich 101, 109; 499 NW2d 752 (1993). See also *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (stating that "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court") (O'Connor, J., joined by Rehnquist, C.J., and Ginsburg and Breyer, JJ.); see also *id*. at 77 (Souter, J., concurring), 80 (Thomas, J., concurring in the result), 86-87 (Stevens, J., dissenting on other grounds), and 95 (Kennedy, J., dissenting on other grounds); 147 L Ed 2d 49 (2000). That dire interest " 'does not evaporate simply because they have not been model parents or have lost temporary custody of their child[ren] to the state.' " *In re Trejo*, 462 Mich at 373-374, quoting

*Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). Accordingly, that custody with natural parents serves a child's best interests " 'remains a presumption of the strongest order and it must be seriously considered and heavily weighted in favor of the parent.' " *Heltzel v Heltzel*, 248 Mich App 1, 25; 638 NW2d 123 (2001), quoting *Deel v Deel*, 113 Mich App 556, 561; 317 NW2d 685 (1982) (emphasis omitted).

### A. TERMINATION UNDER MCL 712A.19b(3)(b)(*ii*)

The only injury alleged to have occurred in connection with this case is the dehydration of the youngest child, and the kidney failure and other complications that resulted.

MCL 712A.19b(3)(b) authorizes termination of parental rights where the child, or the sibling of the child suffers physical injury or physical abuse or sexual abuse under any of the following conditions:

> (*i*) The parent's act caused the physical injury or physical or sexual abuse and . . . there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and . . . there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

> (*iii*) A nonparent adult's act caused the physical injury or physical or sexual abuse and . . . there is a reasonable likelihood that the child will suffer from injury or abuse by the nonparent adult in the foreseeable future if placed in the parent's home.

Petitioner has not alleged grounds under subparagraph (*i*) or alleged that respondent-father's act "caused the physical injury." Rather, it relies on only

subparagraph (*ii*) and argues that respondent-father "had the opportunity" to prevent the harm caused by the dehydration.

"Contextual understanding of statutes is generally grounded in the doctrine of *noscitur a sociis*: '[i]t is known from its associates' . . . . This doctrine stands for the principle that a word or phrase is given meaning by its context or setting." *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002) (quotation marks and citations omitted).

Applying this principle, we conclude that subparagraph (b)(*ii*) must be interpreted in the context of its sister subparagraphs, (b)(*i*) and (b)(*iii*). It is clear under these provisions that for physical injury to fall within MCL 712A.19b(3), it must be caused by a "parent's act" or a "nonparent adult's act" and not merely contributed to by an unintentional omission. Accordingly, subparagraph (*ii*) is intended to address the parent who, while not the abuser, failed to protect the child from the other parent or nonparent adult who is an abuser. We reject the suggestion that subparagraph (*ii*) was intended to be broader than subparagraphs (*i*) and (*iii*) in that it could apply merely to a negligent failure to respond to an accidental injury or naturally occurring medical condition not caused by an "act" of a parent or other adult.

Indeed, the caselaw applying this subparagraph has invariably involved abusive contact with the child. See *In re Sours Minors*, 459 Mich 624, 635-636; 593 NW2d 520 (1999) (several assaultive acts, including domestic violence); *In re Ellis*, 294 Mich App 30, 31-33; 817 NW2d 111 (2011) (severe physical injuries resulting from physical abuse); *In re HRC*, 286 Mich App 444, 449-461; 781 NW2d 105 (2009) (sexual abuse); *In re*

*Archer*, 277 Mich App 71, 73-75; 744 NW2d 1 (2007) (excessive corporal punishment).

For these reasons, we conclude that MCL 712A.19b(3)(b)(*ii*) did not apply to this case. As we will now discuss, however, medical neglect may constitute statutory grounds for termination under the three other provisions of MCL 712A.19b(3) on which the trial court relied.

### B. TERMINATION UNDER MCL 712A.19b(3)(c)(*i*), (3)(g), AND (3)(j)

The trial court concluded that termination of respondents' parental rights was warranted under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (3)(g) (failure to provide proper care and custody), and (3)(j) (children will likely be harmed if returned). We agree with the trial court regarding the youngest child, but hold that the court erred by extending its reasoning to the three older children.

#### 1. THE YOUNGEST CHILD

In the course of pleading to the court's exercise of jurisdiction over the children, respondent-father agreed that respondents' youngest child was in his care and custody when she went approximately 16 hours without consuming food or fluid, that he should have known that the child needed medical care but failed to obtain it, and that as a result medical professionals found the child to be severely dehydrated and profoundly ill.

A pediatric nephrologist testified that she was consulted to evaluate the child's acute kidney injury and found her "still in the process of being re-hydrated," but "[t]he rest of it was pretty normal." The expert advised that children become dehydrated more easily than adults and so the condition can arise "very quickly," and

elaborated that a three-month-old child "should be feeding every two to three hours," and that doing without for 16 hours "would cause the child to be severely dehydrated." The nephrologist stated that, of the various signs of infant dehydration, she would expect a parent in respondent-father's position to notice decreased urination and saliva production.

The nephrologist described the child's kidney failure as an acute condition, meaning an "isolated event," not something that had been ongoing for her entire three months. She further reported that the child was now off her medications and "doing well," with kidney size and electrolytes normal.

The expert testified that although the infant was born after only 33 weeks of gestation, at the time of the dehydration incident she was "pretty much term as far as . . . gestational age" and thus required no handling different from what would be appropriate for a normal newborn; she further agreed that nothing about the child's premature birth predisposed her to becoming dehydrated more easily than other infants of her gestational age. According to the witness, "while she was premature, she had a pretty uneventful course" with no "infections or anything . . . that could have injured her kidneys at that time," and so "didn't have any increased susceptibility other than being a baby[.]"

Respondents' family pediatrician testified on respondents' behalf, stating that he started caring for respondents' oldest child when that child was a toddler and thereafter saw all the children regularly for both illnesses and routine examinations and that he had never detected any signs of neglect or abuse. He further stated that "they were pretty normal kids and I didn't have specific concerns about their care," and that they were all well fed and generally healthy. Asked if consumption

of the controlled substances associated with respondent-mother during pregnancy could contribute to a premature birth, the doctor answered that it "might," but elaborated, "on the other hand, there are babies . . . whose mothers have used the substances [who] were born on time," and that "there are lots of things that can trigger a premature birth." Similarly, the nephrologist stated that substance abuse, including tobacco smoking, can cause premature birth, but declined to testify that there was a causal link in this case.

### a. RESPONDENT-FATHER

Respondent-father's responsibility for neglecting to notice something amiss with, or otherwise attend to, his youngest child as she went several hours without taking nourishment or fluid before rapidly slipping into a life-threatening condition is a matter admitted by him, and well emphasized by the trial court. Also of concern, as the trial court noted, is that the child's cerebral palsy presents serious and enduring parenting challenges. Although there was no evidence that respondent-father was intoxicated at the time of the dehydration incident, the trial court did not clearly err by regarding respondent-father's persistent substance-abuse problem as heightening concerns that such neglect could recur. Nor did the court err by attaching significance to respondent-father's failure to participate in, or benefit from, services relating to caring for a child with cerebral palsy, or to attend most of that child's medical appointments. The seriousness of the incident of medical neglect, considered along with the child's special needs, respondent-father's failure to demonstrate a willingness to undertake the special efforts that those special needs demanded, and his failure to get his substance-abuse problem under control, supported the trial

court's conclusions for purposes of MCL 712A.19b(3)(c)(*i*) and (3)(g) that respondent-father might well again fail to respond properly to a serious medical condition that might arise with the child, and for purposes of (3)(j) that the child faced a reasonable likelihood of harm if returned to respondent-father's care.

### b. RESPONDENT-MOTHER

Respondent-mother was not present for any part of the dehydration incident and thus cannot be deemed negligent in that regard. Her admitted drug use during pregnancy raises serious concerns, however, even though there was no medical testimony linking that drug use to the child's prematurity, her bout with dehydration, or her mild cerebral palsy.

Significantly, the drug use does not stand alone. Evidence was introduced of several behaviors of respondent-mother immediately after giving birth that raised concerns among the medical staff about her ability to care for a newborn. More significantly, even after the infant's cerebral palsy diagnosis, respondent-mother failed to attend virtually all of the dozens of medical appointments for the baby, failed to attend programs intended to educate her about that condition, and refused to sign paperwork to facilitate the child's receiving physical therapy.

A lack of cooperation with reunification services, or other court-ordered conditions, can bear on a termination decision, if that lack of cooperation relates to issues of abuse or neglect. See *In re Trejo Minors*, 462 Mich at 346 n 3. Such a failure "should not be over-emphasized and . . . is not determinative of the outcome of a termination hearing." *In re Bedwell*, 160 Mich App 168, 176; 408 NW2d 65 (1987). However, the failure to participate

in services directly linked to the ability to care for a special needs, or medically fragile, child bears directly on issues of neglect.

For these reasons, the trial court did not clear err by concluding that termination was warranted under MCL 712A.19b(3)(c)(*i*), (3)(g), and (3)(j).

### 2. ANTICIPATORY NEGLECT

The trial court terminated respondents' parental rights to their three older children by emphasizing respondents' respective failures to gain control over their substance-abuse habits and heavily relied on the doctrine of anticipatory neglect, according to which "[h]ow a parent treats one child is certainly probative of how that parent may treat other children." *In the Matter of LaFlure*, 48 Mich App 377, 392; 210 NW2d 482 (1973); see also *In re AH*, 245 Mich App 77, 84; 627 NW2d 33 (2001). However, the trial court nowhere suggested, and no evidence was offered to prove, that either respondent had ever abused or neglected any of their three older children.

Moreover, the ages and medical conditions of the three older children stand in sharp contrast to that of the youngest child. Unlike the latter, who requires special medical care for which respondents seemed to under-appreciate the need, no such special care was required for the older children. Moreover, respondents had cared for those children from birth without incident, including any allegation, let alone proof, that they had abused or neglected the three older children at any time. While anticipatory neglect can militate in favor of termination, under the unusual circumstances of this case, the doctrine has little bearing. Again, no allegations of abuse or neglect have ever arisen in connection with the three oldest children, and the only allegations of negligence underlying

this case concern respondent-mother's continued substance abuse during her pregnancy with the youngest child, and respondent-father's failure to act promptly in response to that infant's rapid medical deterioration. The three older children ranged in age from five to twelve years at the time of termination, and, thus, did not share their infant sister's medical vulnerabilities or inability to articulate personal needs or discomforts. Moreover, concerns over the youngest child's cerebral palsy hardly militated in favor of terminating parental rights to the older children, who suffered from no such special need. See *In re Newman*, 189 Mich App 61, 71; 472 NW2d 38 (1991) ("We do not consider it appropriate to destroy a family's relationship with five children if the major problem appears to be the parents' inability to cope with one of them . . . .").

The trial court's concern for both respondents' demonstrated failure to get their substance-abuse problems under control was certainly justified. However, drug use alone, in the absence of any connection to abuse or neglect, cannot justify termination solely through operation of the doctrine of anticipatory neglect.

Cases that come before this Court often dramatically illustrate that substance abuse can cause, or exacerbate, serious parenting deficiencies, but the instant case is a poor example. We do not mean to imply any approval of the protracted, and sometimes illegal, use of prescription medications so much in evidence in this case, even as we refrain from repeating the trial court's apparent mistake of simply assuming that overuse, or illegal acquisition, of such medications is itself ground for concluding child neglect or abuse will ever result from it.[7]

---

[7] Indeed, an early signal that consumption of prescription medication would be overvalued in this case was when, at the initial dispositional

Termination of parental rights requires "both a failure and an inability to provide proper care and custody," which in turn requires more than "speculative opinions . . . regarding what *might* happen in the future." *In re Hulbert*, 186 Mich App 600, 605; 465 NW2d 36 (1990). In the case of the youngest child, we credit the trial court's concern that respondents' continued substance-abuse issues, considered along with their failure to attend medical appointments or benefit from services offered to provide guidance in dealing with cerebral palsy, heightens the risk that respondents might again fail to appreciate the special needs and vulnerabilities of their infant daughter. But because no such special needs or vulnerabilities exist in relation to the three older children, we conclude that the trial court erred by invoking anticipatory neglect to extend those concerns to them as well.

For these reasons, we conclude that the trial court clearly erred by finding that termination of respondents' parental rights to the three older children was warranted under MCL 712A.19b(3)(c)(*i*), (3)(g), or (3)(j).[8]

### C. BEST INTERESTS

Once a statutory basis for termination has been

hearing, the caseworker expressed her understanding that both respondents had prescriptions for hydrocodone, and that tests revealed concentrations of that drug well within therapeutic levels, but nonetheless insisted that respondents terminate what the witness understood to be respondents' respective physician-directed courses of treatment in deference to her own general concerns about the hazards of that pharmaceutical.

[8] Although petitioner raised other concerns regarding respondents' parenting prospects, including housing and emotional stability, there is no suggestion that any such problems on respondents' parts have ever resulted in any abuse or neglect of the children, and nothing in evidence suggests that that would suddenly change after ten years of parenting. Accordingly, those concerns do not themselves, separately or collectively, justify termination of parental rights.

shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests. MCL 712A.19b(5). Best interests are determined on the basis of the preponderance of the evidence. *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013).

Because we conclude that the trial court erred by concluding that any of the statutory bases for termination were proved in connection with the three older children, we need not review the court's best-interest determinations as applied to them. However, because our decision should result in the return of the three oldest children to respondents, and thus significantly change the family dynamics from what the trial court envisioned when originally deciding this case, we remand this case to the trial court to determine anew whether termination of respondents' parental rights to the youngest child is in the latter's best interests. The court should consider all facts and circumstances that have occurred up to the date of its new decision.

### III. CONCLUSION

The court erred as a matter of law by concluding the medical neglect involved in this case constituted failure to prevent physical harm for purposes of MCL 712A.19b(3)(b)(*ii*).

The trial court did not clearly err by concluding that termination of respondents' parental rights to their youngest child was warranted under MCL 712A.19b(3)(c)(*i*), (3)(g), and (3)(j). However, the court clearly erred by extending that result to the older three children on the basis of anticipatory neglect.

We affirm the decision below as it concerns the trial court's findings of three statutory bases for termination

in connection with respondents' youngest child, and remand for redetermination of that child's best interests. We reverse in all other respects.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

MURPHY, C.J., and RIORDAN, J., concurred with SHAPIRO, J.