*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LEICHTY, Minors.

UNPUBLISHED
April 27, 2023

No. 362965
Monroe Circuit Court
Family Division
LC No. 20-026003-NA

Before: M. J. KELLY, P.J., and SWARTZLE and FEENEY, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to his minor children under MCL 712A.19b(3)(j) and MCL 712A.19b(3)(k)(*ii*). For the reasons set forth in this opinion, we affirm.

## I. BASIC FACTS

In December 2020, petitioner, the Department of Health and Human Services, filed a petition asking the court to take jurisdiction over the children and to terminate respondent's parental rights to them after one of respondent's daughters, MRL, disclosed that respondent had sexually abused her when she was between the ages of six and eight years old. Respondent requested a jury trial on the matter of whether there were statutory grounds to take jurisdiction over the children. Because of delays attributable to the COVID-19 pandemic, the jury trial was not held until April 2022.

MRL, who was almost 16 years old at the time of the adjudication trial, testified about two incidents of sexual abuse. First, she testified that she was sexually abused by respondent when she was between the ages of six and eight. She recounted that she was lying on the couch with respondent and fell asleep. Respondent began to rub over her underwear, inside her pajama pants. He then rubbed her vagina between her inner and outer labia. He continued for approximately five minutes before she got up and left the couch. Although MRL went to her mother, she did not disclose the abuse at that time. The second incident of abuse was related to respondent bathing her. She explained that respondent washed her vagina with his bare hand and that, while doing so, he rubbed her inner and outer labia for a long period. She told him to stop and he did so. Another time she started to feel "weird" with how long he was rubbing her vagina while he was washing her, but he stopped before she asked him to stop.

-1-

MRL confronted respondent about the abuse around Halloween 2020. She recorded one of the conversations and a copy of that recording was admitted into evidence. In the recording, respondent asserted that he touched MRL because there was a hair trapped in her underwear. He stated that he told MRL's mother about the incident so she could make sure that MRL was not hurt when he pulled the hair. MRL, however, did not recall the incident happening that way at all, and she stated that her mother also did not recall that version of events.

At trial, respondent denied touching MRL's genital area. He recalled lying on the couch with MRL when he felt a hair "tickle" his arm. He pulled the hair and when it did not give, he wrapped his fingers around it and pulled harder. Respondent testified that when he pulled the hair he inadvertently gave MRL a "front wedgie." He stated that his reaction "was instantly to push the underwear back out which is how [his] hand became between her body and her underwear." He claimed that MRL gave him a funny look and went to her mother's room. He stated that the next day, because he was concerned that the hair might have injured MRL, he called MRL's mother and asked her to check on her. Respondent also admitted that he washed his daughter's "butt" with his hand after he lathered it up with soap; he explained that he did not want to use a "loofa" on her genital area because it was a "rough thing." He stated that he did not wash her vagina with his bare hand because MRL's mother, who was in the room with them, told him to use a washcloth after he had already washed MRL's "butt."

Respondent stated that his daughter's allegations were precipitated by tensions between him and her that started around June 2020.[1] He described his daughter as defiant and unwilling to assist him with caring for her younger sister. He described one incident where he asked her whether she had fed her younger sister, but MRL, who was on her phone, was not responsive. The incident escalated into an argument where he demanded her phone, she refused to surrender it, he tried to take it, and she kicked him from where she was sitting in a recliner. He grabbed her legs and pushed them up as if he was going to "crack her hind end," but he did not. She left for her bedroom. He decided to record the altercation and followed her to her bedroom, repeatedly demanding that she turn over her phone. He testified that she pushed him a couple of times, including once where his arm or hand hit the dresser. He stated she said something along the lines of "good, I hope it hurt." After that incident, the possibility of him reporting MRL to law enforcement was discussed. Respondent testified that MRL was aware of that possibility. Respondent also stated that MRL would talk down to him, calling him an idiot, dumb, and stupid.

Following the trial, the jury found that there were statutory grounds for the court to take jurisdiction over the children.

---

[1] MRL denied making sexual-abuse allegations because she was angry at respondent. Rather, she testified that she stated that she disclosed the abuse to protect her younger sisters.

A dispositional hearing was held in April 2022. A caseworker testified that respondent had a prior history with Child Protective Services that was related to one of the children's half-siblings and it also involved sexual abuse. That case was closed without services. Respondent testified that the sexual abuse alleged in that case did not involve him. The caseworker testified that respondent was also required to register as a sex offender due to criminal conduct committed in Florida that apparently involved the sexual battery of a child under the age of 11. Respondent testified that the complainant in that case was close in age to him at the time of the offense. The caseworker also testified that MRL had disclosed that respondent had rubbed her vagina over and under her clothes and that, in the process, he had penetrated her labia. She also testified that the bathing incidents were concerning because, as related by MRL, respondent touched her vagina with his bare hand for a period longer than was necessary to accomplish the task of washing her. The caseworker opined that the disclosures MRL made to her were consistent with MRL's testimony at the adjudication trial.

The caseworker testified that based on respondent's conduct toward MRL, there were concerns that respondent would engage in similar behavior with his youngest two daughters, so they would be at risk of harm if returned to his care. She added that MRL was at risk of severe emotional abuse if she were to be returned to respondent's care. With regard to MNL, the caseworker explained that based on respondent's conduct toward MNL, there was also a risk of emotional harm if she were returned to his care. Indeed, as will be discussed in detail below, MNL testified at length of respondent's conduct toward her and its impact on her mental health.

As it relates to the children's mental health, a therapist who met with the children once a month testified that each of the children had engaged in some therapy. She stated that the younger children appeared to be okay and that they had not been informed of the circumstances leading to their separation from respondent. She noted that they had not seen respondent in over a year and that they did not ask about him. She could not say whether they had a bond with respondent.

The therapist testified that MRL displayed "increased anxiety" and when she discussed respondent, she "would become more guarded and more tense." Since engaging in therapy and since testifying at the adjudication trial, MRL appeared to be less stressed. She opined that MRL had a "strained bond" with respondent. With regard to MNL, the therapist—who was not MNL's regular therapist—testified that she was "very guarded" and only engaged in "very limited" communications with her. When MNL did open up, she discussed being afraid of seeing respondent and she described his behaviors as controlling and manipulative. When discussing the matter, she would display "tics," such body tremors and moving her head uncontrollably. The therapist opined that MNL also had a "strained bond" with respondent.

Following a dispositional hearing, the trial court found statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(j) and MCL 712A.19b(3)(k)(*ii*). The court also found that termination of respondent's parental rights was in the best interests of the children. This appeal follows.

## II. PROCEDURAL IRREGULARITIES

Respondent briefly argues that reversal *may* be required because of "procedural irregularities." We address each asserted "irregularity" in turn.

### A. TIMELINESS OF ADJUDICATION

Under MCL 712A.19b(1), the trial court is required to "issue an opinion or order regarding a petition for termination of parental rights within 70 days after the commencement of the initial hearing on the petition." Likewise, MCR 3.977(I)(l) provides that "[i]f the court does not issue a decision on the record following the hearing, it shall file its decision within 28 days after the taking of final proofs, but no later than 70 days after the commencement of the hearing to terminate parental rights." Here, the hearing on the petition to terminate respondent's parental rights was held on April 15, 2022, was continued on April 21, 2022, and was finished on August 16, 2022. Thus, there were more than 70 days between when the initial hearing commenced and when the court issued its opinion terminating respondent's parental rights. The record reflects that the delay was primarily caused by the COVID-19 pandemic. On appeal, rather than raising any specific argument, respondent states that he is presenting the issue "for consideration" because he has "never been through a pandemic of this nature in his lifetime" and because there was "little guidance" for the pandemic "in Michigan caselaw." Stated differently, respondent suggests that this Court should analyze the issue to determine whether any reversible error arises under the circumstances present in this case, but he makes no argument supporting a determination that reversal is warranted. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Accordingly, this issue has been abandoned on appeal. And, even if it were not, MCL 712A.19b(1) expressly states that the failure to reach a decision within the timeline "does not dismiss the petition." Rather, as explained in *In re TC*, 251 Mich App 368, 371; 650 NW2d 698 (2002), failure to follow the time limits set for in the court rules is not a ground for reversal "unless this Court believes that failure to do so would be inconsistent with substantial justice." Here, as acknowledged by respondent, the delay was attributable to the COVID-19 pandemic. Further, respondent never objected to the delay. Under such circumstances, the failure to strictly comply with the time limits is not inconsistent with substantial justice.

### B. REFERENCE TO PRIOR INCARCERATION

Next, during the adjudication trial, MRL indicated that respondent had previously been incarcerated in Florida. Respondent's lawyer declined to have a curative instruction provided to the jury because he did not want to highlight that respondent had been incarcerated. On appeal, respondent suggests that his trial lawyer may have been ineffective for not requesting a curative instruction. No analysis is offered in support of his assertion that there *might* be an error, however. Because respondent has failed to support his argument, we conclude that this issue has been abandoned on appeal. See *Mitcham*, 355 Mich at 203.

## C. THE TRIAL COURT'S QUESTIONING OF WITNESSES

Respondent next argues that reversal is required because the trial court excessively questioned respondent and MRL during the adjudication trial. At trial, respondent's lawyer challenged the length of the trial court's questioning of witnesses. However, respondent's lawyer declined to have a curative instruction read to the jury regarding the questioning that already occurred. On appeal, respondent notes that a trial court is permitted to question witnesses under MRE 614 and MCR 3.923. He asserts that "whether or not this trial court acted properly is a question" for this Court to decide, and he states, without analysis or support, that he believes the trial court's questioning was improper. Because respondent did not support his position on appeal, we conclude that this issue has been abandoned. See *Mitcham*, 355 Mich at 203.

## III. TERMINATION OF PARENTAL RIGHTS

## A. STANDARD OF REVIEW

Respondent argues that the trial court erred by finding that clear and convincing evidence supported termination of his parental rights under MCL 712A.19b(3)(j) and (k)(*ii*), and by finding that termination of his parental rights was in the children's best interests. This Court reviews for clear error the trial court's finding that statutory grounds for termination were established. *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 358502 & 358503); slip op at 5. The trial court's finding that termination of respondent's parental rights was in the children's best interests is also reviewed for clear error. *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018). "A trial court's decision is clearly erroneous '[i]f although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.' " *Id.* (quotation marks and citations omitted).

## B. ANALYSIS

## 1. STATUTORY GROUNDS

MCL 712A.19b(3)(j) and (k)(*ii*) permit termination of parental rights if the court finds by clear and convincing evidence:

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

> (k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

> * * *

> (*ii*) Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate.

It is only necessary to establish one statutory ground for termination. *Atchley*, ___ Mich App at ___; slip op at 6 n 5.

Here, MRL testified that when she was between the ages of 6 and 8, while she was on a couch with respondent, he rubbed her vagina, penetrating her with his fingers. She also testified that he rubbed her vagina with his bare hand for an extended period of time while he was bathing her. Respondent denied touching MRL's genital area and proffered an innocent, and yet implausible, explanation for how his hand ended up between MRL's underwear and her vagina. He also asserted that he only washed her "butt" with his bare hand and that he washed her vagina with a wash cloth after being instructed to do so by MRL's mother. The court found MRL's testimony to be credible and found respondent's testimony that he was only pulling a hair from MRL's underwear to be implausible. The court's findings, which are supported by the record, are not clearly erroneous, and we defer to the court's credibility determinations. See *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

Moreover, the court found that there was a reasonable likelihood that the children would be harmed if returned to respondent's care. That finding was also supported by the record. Respondent's conduct in this case included sexually abusing MRL when she was a young child. MNL corroborated that respondent also bathed her "butt" and vagina with his bare hand for an extended time when she was a young child. Further, one of the younger daughters disclosed to MNL that she had secret "long kisses" with respondent. Finally, respondent was required to register as a sex offender because of a sexual battery against a victim under the age of 11 years of age.

Respondent's conduct toward MNL also indicated that there was a reasonable likelihood that the children would be harmed if returned to his care. The record reflects that MNL was fearful of being physically hit by respondent. She described being chased into corners by him, being grabbed and placed over his knee, and being hit hard enough that she would feel it days later. She testified to fleeing the house when he was extremely angry at her because she was afraid of being hit. MNL also testified that respondent would sleep with her in her twin-size bed. She was uncomfortable and would have not allowed it if she had been awake when he got in her bed. Also related to sleeping, MNL testified that respondent "guilted" her into sleeping in his bed while respondent and MNL's mother were in the process of getting divorced. And, when she was not with him, he would sleep with her childhood stuffed toy. Respondent also would defecate for long periods of time while she was showering. His prolonged presence in the bathroom made her uncomfortable because she was worried he would see her silhouette. She would have to stay in the shower until the water turned cold.

MNL also recounted that after she came out as bisexual, he woke her up from a nap and screamed at her repeatedly to tell him who she was having sex with. Another time, he picked her up from her boyfriends' house. She was wearing a black skirt and thigh-highs and, rather than normal conversation, he asked whether she was "trying to be sexy." He also told her that she looked like a "whore" when she was wearing a skeleton costume. She stated that he made her feel self-conscious about whether she was dressing too provocatively.

MNL also testified that respondent would emotionally abuse her and described him as manipulative. She explained that he made her feel insubordinate and "like a nuisance." She stated she could never do anything to please him. She described him getting into "screaming matches" with MRL and then try to make himself into the victim. He would cry in public and say things that made MNL feel as if she were "ruining everything." If she went to cry and calm herself in a bathroom, when she would return, he would yell at her and make her cry again. He would make her feel embarrassed for crying and would tell her that she "made him look like a bad parent" when she cried. MNL testified that he made her scared to speak her mind on anything because if she said anything that he did not agree with he would get angry and then accuse her of attacking him for having a different opinion. She recounted that, during her parents' divorce, respondent would "trauma dump" on her. He told her how his oldest son—her half brother—left him, how his oldest daughter—her half-sister—does not want anything to do with him, how respondent's father had held a shotgun to his head when he was 12 years old, and how respondent's mother was a drug addict, who dumped him on the streets. MNL explained that he would tell her the stories to make her feel guilty about being mad at him and she would always end up crying and apologizing to him. She felt that everything she did was wrong.

Finally, MNL testified that she was depressed and, at times, suicidal. Respondent was not supportive. She recalled one incident where she got into a fight with respondent and retreated to the bathroom to shower. Respondent burst in, flipped the curtain open while she was naked, and pulled a switchblade out. He told her that if she wanted to kill herself so badly that she should do it. She testified that she was freaking out and crying and that she wanted help, not a parent telling her to kill herself. She added that, on other occasions, he would tell her about people he knew who committed suicide and he would describe them as "selfish" and as "being in hell permanently for it."

Respondent argues on appeal that although there is evidence that he sexually abused MRL, the testimony reflects that the alleged abuse occurred between 7 and 10 years before she disclosed it. He suggests that, given the length of time between the abuse and the disclosure, and given that there was no testimony that he caused any harm to the younger children, it is speculative to find that there was a reasonable likelihood that they would be harmed if returned to his care. However, the doctrine of anticipatory neglect supports the trial court's finding of statutory grounds. This doctrine provides that a parent's "treatment of other children is indicative of how they would treat the child in question." *In re Foster*, 285 Mich App 630, 631; 776 NW2d 415 (2009). Although "the probative value of such an inference is decreased by differences between the children, such as age and medical conditions," *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020), we conclude that the anticipatory neglect doctrine holds considerable inferential weight here. Respondent sexually abused MRL was she was between eight and ten years of age. The mental, emotional, and physical abuse of MNL occurred from when she was a young child until she was a teenager. At the time of termination, the youngest two children were approximately 13 years old and 7 years old, respectively. Thus, they are in a similar age range as their older siblings were at the time that they were abused. Respondent places the blame for the breakdown in his relationship with MRL on MRL, whom he described as defiant. Further, MNL's testimony shows that he also blamed her whenever his relationship with her became strained. Given his conduct toward the older children, it is reasonable to infer that the younger children will be subjected to the same types of harm if they are returned to his care, especially in light of his continued insistence that he is

without blame. The trial court, therefore, did not clearly err by finding that there is a reasonable likelihood that each of the children will be harmed if returned to respondent's care.

## 2. BEST INTERESTS

> "Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance Minors*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). " '[T]he focus at the best-interest stage has always been on the child, not the parent.' " *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015), quoting *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance Minors*, 306 Mich App at 733. [*Keillor*, 325 Mich App at 93.]

In deciding whether termination of parental rights is in a child's best interests, a trial court may consider the following factors:

> [T]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's wellbeing while in care, and the possibility of adoption. [*In re Rippy*, 330 Mich App 350, 360-361; 948 NW2d 131 (2019) (citations omitted).]

Respondent suggests that the court's best-interests findings were clearly erroneous. He points out inconsistencies between his testimony and the testimony from MRL and MNL regarding the alleged abuse. For instance, he states that he never hit MNL with a flip-flop, that he did not actually intend for MNL to hurt herself when she expressed that she was suicidal, and that he did not interfere with MNL's use of the bathroom. He also points out that he had a strong bond with MRL, noting a time when he helped her when she had a conflict with her softball coach. Respondent additionally points to photographs depicting him with his children and to testimony regarding his interactions with the children in public. He states that this testimony shows that he had a strong bond with the children and was a good father to them. He also recounted specific instances with the younger girls that was indicative of his relationship with them. He complains that the court did not consider his testimony when reaching its best-interests determination.

Yet, the record reflects that at the time of trial, his bond with the older children was strained because of his sexual, emotional, and psychological abuse of them. Neither of the older girls wanted to be returned to his care, and they stated that they would only do so to protect their younger sisters in the event that respondent's parental rights were not terminated. Further, given that it had been over one year since he saw the younger children, his bond with them was diminished. At the time of the termination hearing, the children were bonded with each other and were bonded to their mother, but the bond with respondent was either strained or diminished.

Moreover, the bond between respondent and the children is not the only factor. The court found that the children would be at a risk of sexual and emotional abuse if returned to respondent's care. That finding was supported by the record, which, as noted above, shows that the children were similarly situated to their older siblings who had been abused. The court was also free to consider the advantages of the children's mother's home over respondent's. The children's mother had remarried, all four children were thriving in her care, she was supporting their emotional needs, and the children were closely bonded with her new husband, who had supportive and healthy relationships with all four children. On this record, we conclude that a preponderance of the evidence supports the trial court's finding that termination of respondent's parental rights was in the best interests of all four children.

Affirmed.

/s/ Michael J. Kelly
/s/ Brock A. Swartzle
/s/ Kathleen A. Feeney