*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* T. ROGERS, Minor.

UNPUBLISHED
January 11, 2024

No. 366452
Midland Circuit Court
Family Division
LC No. 20-005175-NA

Before: BOONSTRA, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

Respondent[1] appeals as of right the trial court's order terminating his parental rights to the minor child, TR, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), MCL 712A.19b(3)(c)(*ii*) (failure to rectify other conditions), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

In October 2020, petitioner, the Department of Health and Human Services (DHHS), filed a petition to take jurisdiction of TR. The DHHS alleged that respondent was the putative father of TR, and that respondent was currently an "absconder from parole and has multiple warrants." In an amended petition filed in November 2020, the DHHS alleged that a "U-cord drug screen" was completed for TR on October 23, 2020, and the "U-Cord drug screen came back positive for Buprenorphine, Cocaine, and Cannabinoids." The DHHS alleged that TR was experiencing withdrawal symptoms, which included "consistent vomiting, sneezing, fevers, and tremors."

In November 2020, the referee authorized the petition with respect to the mother, and TR was removed from her care and placed in a foster home with his sister, AH. In December 2020, a putative-father hearing was held. At the hearing, the mother admitted that respondent was the

---

[1] While the mother was originally designated as a respondent, she voluntarily relinquished her parental rights to TR and is not a party to this appeal. Accordingly, we simply refer to respondent-father as "respondent" and respondent-mother as "the mother."

biological father of TR. The referee noted that respondent was unable to be personally served because "his whereabouts are unknown as he appears to be dodging warrants for his arrest." The referee found that there was probable cause to believe that respondent was the natural father of TR, and the referee noted that respondent would be given 14 days to establish his relationship to TR.

From December 2020 through March 2021, respondent did not complete an affidavit of parentage, engage with the DHHS, or have any involvement with TR. By June 2021, respondent had signed the affidavit of parentage, and the referee adopted the prosecutor's recommendation that respondent's parenting time remain suspended. Respondent continued to refuse to meet with the DHHS or have any involvement in TR's life until he was arrested following a police standoff in August 2021.

On October 14, 2021, a bench trial was scheduled for respondent, but the parties reached a plea agreement. Respondent admitted that he was the legal father of TR, and he admitted that he was currently incarcerated in the Bay County Jail and was unable to provide proper care and custody for TR. The referee accepted the plea and took jurisdiction of TR with respect to respondent. During the case, respondent remained incarcerated. Respondent completed a psychological evaluation, participated in parenting classes, and completed portions of a substance abuse curriculum that was provided to him. Respondent had one video visit with TR on his first birthday, but respondent did not send TR any written cards or letters, and he had not seen TR in person since TR was born.

In June 2022, the DHHS filed a supplemental petition requesting termination of respondent's parental rights pursuant to MCL 712A.19b(3)(a)(*i*), (a)(*ii*), (c)(*i*), (c)(*ii*), (g), and (j). The DHHS requested termination of respondent's parental rights on the bases of his refusal to meet with the DHHS to establish paternity until he was arrested, lack of dedication to TR and being a father, and TR's need for permanency, stability, and continuity. Following the termination hearings on March 6, 2023, April 27, 2023, and April 28, 2023, the referee issued a written order and opinion finding that the DHHS had established statutory grounds for termination pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), and that termination of respondent's parental rights was in TR's best interests. Respondent requested a review of the referee's recommendation, and the trial court adopted the referee's recommendation to terminate respondent's parental rights in an opinion and order dated May 23, 2023.

This appeal followed.

## II. STATUTORY GROUNDS

On appeal, respondent argues that the trial court clearly erred by finding that there were statutory grounds to support terminating his parental rights. We disagree.

"We review the trial court's determination of statutory grounds for clear error." *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 272-273 (quotation marks and citation omitted).

A trial court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds by clear and convincing evidence that "182 or more days have elapsed since the issuance of an initial dispositional order" and "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." The trial court took jurisdiction on October 14, 2021, and respondent's parental rights were terminated on May 23, 2023. Therefore, more than 182 days had elapsed since the issuance of an initial dispositional order as required by MCL 712A.19b(3)(c).

Respondent was given 19 months to correct the conditions that led to adjudication, which were his inability to care for TR because of his "active warrants for arrest, his criminal history, lack of employment, and his lack of housing." The referee found that, even if respondent was released from prison, respondent "could not begin to demonstrate his ability to provide a safe home, transportation, stable employment and remain out of trouble until sometime later." The referee determined that respondent "will remain unable to provide a safe, stable home for [TR] within a reasonable time" on the basis of respondent's extensive criminal history and "continued blatant avoidance of the court orders." The referee concluded that it would be "unreasonable to require [TR] to continue to wait before he can have permanency in his life."

The record supports the finding that respondent would not be able to rectify the conditions that led to adjudication within a reasonable time considering TR's age. At the termination hearing, the DHHS foster care worker testified that TR had been in foster care since he was six days old and that TR had been out of respondent's care for essentially his entire life. The foster care worker testified that respondent refused to engage in services with the DHHS or sign the affidavit of parentage for almost 10 months after TR came within the court's jurisdiction, despite TR being placed in foster care, because respondent had outstanding warrants and did not want to go to prison. At the time of the termination hearing, respondent was still incarcerated and there was no set release date. Although respondent testified that he had a job and housing following his release from prison, the foster care worker opined that it would take respondent 9 to 12 months following his release from prison to rectify the conditions that led to adjudication.

Further, the record demonstrates that respondent failed to benefit from the services provided. See *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014) ("Not only must respondent cooperate and participate in the services, [respondent] must benefit from them.") At the termination hearing, the foster care worker opined that respondent "started to make progress with the substance abuse and the Nurturing Parenting because he did complete those services," but that respondent did not recognize "the severity of how not being a part of his son's life for the first year" had impacted TR and the child-protective proceedings. Respondent had been provided with a substance abuse curriculum but continued to deny that he had a substance abuse problem. Respondent acknowledged that he had sold drugs, but he asserted that he did not have a substance abuse problem and that he never used drugs. Respondent acknowledged that it would not be good for TR to be around drug-dealing, but respondent seemingly disagreed that it would be harmful for TR to be around individuals with a criminal history or the mother, despite that the mother suffered from mental illness and had relinquished her parental rights. Finally, the foster care worker testified that respondent had completed a psychological evaluation, but that he was not truthful about his criminal history in the psychological evaluation.

Also, respondent testified and agreed that he had a criminal history, which consisted of four counts of criminal sexual conduct (CSC) with intent to commit sexual penetration, and respondent explained that he "plead no contest to two of them." Respondent agreed that he was a registered sex offender and that he was sentenced to four years' imprisonment for having sex with a minor. Further, respondent testified that he was convicted of attempted delivery of or manufacturing under 50 grams of a controlled substance in 2017, and respondent agreed that he was charged with possession of a controlled substance, second offense, in 2019. Respondent testified that he was "convicted of the possession," and he agreed that "the second offense was dismissed." In addition, respondent testified that his most recent arrest was "for resisting and obstructing for walking into the house."

In light of respondent's failure to accomplish any meaningful progress in improving the conditions that led to adjudication by the time of the termination trial, we conclude that the trial court's finding in this regard was not clearly erroneous. Accordingly, based on our review of the record, we are not definitely and firmly convinced that the trial court erred when it found by clear and convincing evidence that termination of respondent's parental rights was appropriate under MCL 712A.19b(3)(c)(*i*).[2]

### III. BEST INTERESTS

Next, respondent argues that the trial court erred by determining that termination of his parental rights was in TR's best interests. We disagree.

This Court reviews for clear error a trial court's decision that termination is in a child's best interests. *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 333; 985 NW2d 912 (2022). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*.

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). Whether termination is in the children's best interest must be established by a preponderance of the evidence. *Id.* at 733. The trial court should consider all of the evidence when determining whether it is in the child's best interests to terminate parental rights. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The trial court should consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*., quoting *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (quotation marks omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *White*, 303 Mich App at 714. When determining whether termination is in the best

---

[2] Because only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, we need not address respondent's arguments related to MCL 712A.19b(3)(c)(*ii*), (g), and (j). See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

interests of the child, the trial court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

We conclude that the trial court did not clearly err when it found by a preponderance of the evidence that termination of respondent's parental rights was in the best interests of TR. TR was placed in foster care when he was six days old, and he remained in foster care for two and a half years. Although respondent participated in the case service plan while he was incarcerated, the evidence showed that respondent failed to benefit from the services provided and that it was unlikely that TR could be returned to respondent's care within a reasonable time.

Further, the record demonstrates that TR did not have a bond with respondent and that it would be traumatic for TR to be removed from his foster care placement. Respondent agreed that he had not purchased anything for TR following his birth, and respondent denied sending TR "a card or anything like that." The foster care worker testified that respondent had not had contact with TR since TR was put in foster care "other than a video call for [TR's] first birthday." She testified that TR was "extremely well adjusted to the placement"; that TR had been in the placement, with his sister, since six days after he was born; that TR was "[v]ery well bonded to his sister"; and that it would "very traumatic" if TR was separated from his sister. Additionally, an expert in child psychology testified that she met with TR two times when he was with his sister, AH. The expert reported that TR had a strong attachment to AH, that "[a]ny interruption or change in placement would be a profound loss for TR," and that separation from his sister would "precipitate psychological distress and it could precipitate life-long trauma." The expert noted that respondent was "a new person in [TR's] life," and that "it would be difficult and traumatic for [TR] to begin to have a new relationship with a person that has not been in his life."

Even though respondent testified that he would have a job and housing following his release from prison, respondent failed to demonstrate that he could provide stability and permanency, which had been provided by TR's foster care family. See *White*, 303 Mich App at 714 (holding that the possibility of adoption is a factor to consider in a best-interests analysis). Because TR's foster parents could provide the permanency and stability that TR needed, but respondent would be unable to provide permanency and stability within a reasonable time considering TR's age, we conclude that the trial court did not clearly err by finding that termination of respondent's parental rights was in TR's best interests.

Affirmed.

/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle

-5-