*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* D V LANGE, Minor.

UNPUBLISHED
November 2, 2023

No. 362365
Wayne Circuit Court
Family Division
LC No. 2021-000658-NA

Before: REDFORD, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

In this child protective proceeding, petitioner, the Department of Health and Human Services ("DHHS"), appeals by right the circuit court's order dismissing for lack of jurisdiction the petition to take temporary custody of the minor child, DVL. Because a preponderance of the evidence supports a finding of jurisdiction under MCL 712A.2(b)(1) and (2), we reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2013, through a single parent adoption, respondent adopted five-year-old DVL. Because he had been exposed to trauma and abuse while in the care of his family of origin, DVL treated with both a therapist and a psychiatrist. DVL suffers from post traumatic stress disorder, reactive attachment disorder, oppositional defiance disorder and attention deficit hyperactivity disorder. Over the years, DVL's behaviors escalated and his mental health deteriorated. DVL has a history of attempting to set fires in the family home and attempting to injure family pets. Due to DVL's destructive and sexualized behavior, respondent installed door alarms on his bedroom door and never left him alone with his two siblings. Between the ages of 10 and 13, DVL was hospitalized six or seven times to receive psychiatric care at Hubbard Oaks and Havenwyck for threatening to kill his parents and siblings. The hospitalizations were typically two weeks in duration and were followed by outpatient treatment. As respondent testified at trial, DVL returned home after each hospitalization:

> Yes [out-patient treatment was provided] and each time he was provided with day treatment programs to follow-up with the in-patient treatment and he would complete that and things would be ok for a while and then it would go right back where it was.

-1-

DVL also has a history of sexually inappropriate behaviors at home and while in placement. In November 2020, respondent enrolled then 13-year-old DVL into a year-long out-of-state residential treatment program.[1] Six months in, the program terminated DVL for sexually inappropriate behavior with other residents. DVL returned to respondent's home in April 2021.

After his return to Michigan, DVL's behaviors worsened. In early June 2021, when he attempted to start a fire in the home and threatened suicide, respondent took DVL to St. John Hospital. Respondent sought the hospital admission because she knew DVL first needed to be medically cleared before he could enter into an inpatient treatment program. On June 10, 2021, Children's Protective Services ("CPS") received a referral after respondent informed hospital staff that because of safety concerns, she was unwilling to manage or care for DVL's mental health needs. Thereafter, CPS and the hospital emergency room social worker unsuccessfully searched for a suitable pediatric inpatient psychiatric program for DVL. While at the hospital in the holding area and in the hospital's general population waiting to be transferred, DVL was not receiving treatment; he was only being held until a suitable pediatric psychiatric facility could be found. According to respondent, who was the only witness to testify at the adjudication, the pediatric psychiatric hospitals would not take DVL due to the severity of his issues and "they couldn't guarantee the safety of the other patients."

On July 8, 2021, DVL was not cleared for discharge home. Amazingly, on July 9, 2021, DVL's medical providers at St. John Hospital cleared him for discharge with the recommendation that DVL receive intensive outpatient mental health services. Upon learning of the impending discharge, respondent refused to pick up DVL from the hospital and indicated that she would not allow him to return to her home because it was unsafe for all of them; respondent testified that "to hear that there was no help was . . . heartbreaking." During a July 2021 team decision meeting, CPS offered respondent assistance in securing outpatient mental health services for DVL but she refused based upon DVL's numerous prior short-term inpatient stays, subsequent outpatient treatment. and ongoing mental health issues that made him a significant threat to himself and others

On July 16, 2021, DHHS filed a petition alleging that respondent's abandonment of DVL allowed the court to assume jurisdiction over DVL, as well as his two siblings.[2] At the preliminary hearing, a referee entered an interim placement order that permitted DHHS to place DVL in a residential home. The two-day adjudication trial commenced in May 2022, and concluded in June 2022. At the conclusion of the trial, the court found that a statutory ground to exercise jurisdiction over DVL did not exist. Consequently, it dismissed the petition. This appeal followed.

## II. STANDARD OF REVIEW

We review a trial court's jurisdiction decision for clear error in light of the court's findings of fact. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). A finding is clearly erroneous

---

[1] Respondent testified that the year-long residential program DVL attended in 2020 cost $2000 per month and the parents covered the cost as it was not covered by insurance.

[2] At the preliminary hearing, respondent's other two children were dismissed from the petition and, throughout the lower court proceedings, they remained in the care of their other legal parent.

if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made. *In re Long,* 326 Mich App 455, 460; 927 NW2d 724(2018) (citation omitted). To the extent that the jurisdictional issue presents a question of statutory interpretation, we review that issue de novo. *In re LaFrance,* 306 Mich App 713, 723; 858 NW2d 143 (2014).

## III. ANALYSIS

DHHS argues on appeal that the trial court clearly erred when it refused to exercise jurisdiction over DVL under MCL 712A.2(b)(1). We agree, and further find that the trial court also erred when it failed to assume jurisdiction over the minor child under MCL 712A.2(b)(2).

The purpose of child protective proceedings is the protection of the child. *In re Brock,* 442 Mich 101, 107; 499 NW2d 752 (1993). "Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *Id.* at 108. The adjudicative phase determines whether the trial court may exercise jurisdiction over the child. *Id.* To establish jurisdiction, the petitioner must prove by a preponderance of the evidence that a statutory ground exists under MCL 712A.2(b). *In re SLH,* 277 Mich App 662, 669; 747 NW2d 547 (2008). A "preponderance of the evidence" means evidence of a proposition that when weighed against the evidence opposed to the proposition "has more convincing force and the greater probability of truth." *People v Cross,* 281 Mich App 737, 740; 760 NW2d 314 (2008).

In this case, DHHS requested that the court assume jurisdiction over DVL under MCL 712A.2(b)(1) and (2), which provide that a court has jurisdiction over a child in the following circumstances:

(1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. As used in this sub-subdivision:

(A) "Education" means learning based on an organized educational program that is appropriate, given the age, intelligence, ability, and psychological limitations of a juvenile, in the subject areas of reading, spelling, mathematics, science, history, civics, writing, and English grammar.

(B) "Neglect" means that term as defined in section 2 of the child abuse and neglect prevention act, 1982 PA 250, MCL 722.602.

(C) "Without proper custody or guardianship" does not mean a parent has placed the juvenile with another person who is legally responsible for the care and maintenance of the juvenile and who is able to and does provide the juvenile with proper care and maintenance.

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent

adult, or other custodian, is an unfit place for the juvenile to live in. As used in this sub-subdivision, "neglect" means that term as defined in section 2 of the child abuse and neglect prevention act, 1982 PA 250, MCL 722.602.

We find that the trial court erred when it declined to exercise jurisdiction over DVL under both MCL 712A.2(b)(1) and (2). A preponderance of the evidence established that respondent refused to provide proper or necessary mental health care to her son and that her admitted inability to care for DVL's significant mental health needs, despite repeated efforts to obtain effective treatment for him, rendered her home statutorily unfit.

This Court's recent opinion in *In re Hockett,* 339 Mich App 250; 981 NW2d 534 (2021), guides our resolution of the jurisdictional issue in this case. The facts in *In re Hockett* are substantially similar to those in the present case. In *In re Hockett*, minor child NRH had a history of mental illness that included brief yet frequent hospitalizations, suicidal ideation, and threats of harm to others in the home. *Id.* at 252-253. The respondent-mother similarly refused to take her mentally ill child home from the hospital until he received the help she believed he needed. *Id.* Notably, as in the present case, the Department of Health and Human Services relied on the hospital's determination that NRH should be discharged. *Id.* at 253. The trial court found that NRH came within the court's jurisdiction under MCL 712A.2(b)(1). *In re Hockett,* 339 Mich App at 255. Specifically, the trial court ruled that the respondent failed to provide her child proper care and custody when she refused to pick up NRH from the hospital. *Id.* This Court affirmed the order of the lower court, but determined that jurisdiction was proper under MCL 712A.2(b)(2), not MCL 712A.2(b)(1). *In re Hockett,* 339 Mich App at 256. This Court's analysis of the provisions of MCL 712A.2(b) is instructive:

> It is unfortunate that our statute uses the word "unfit" to describe situations such as this. We note that "the underlying purpose of the statutory scheme is to protect children from an unfit homelife." *In re Sterling*, 162 Mich App 328, 339; 412 NW2d 284 (1987). Unfitness connotes active wrongdoing, which we do not see in this case. The statute, however, implies some understanding of the existence of parents who do not have the resources to provide for their children in the phrase "when able to do so." *This mother was unable to manage the complex mental health needs of her child. The referee correctly determined that respondent declined to retrieve her child upon discharge. The referee also correctly noted that respondent had the physical capacity to retrieve her minor child and did not do so.* Our concern is that this mother, who took desperate action to get care for her child, is now labeled "unfit" and listed on a registry for persons who acted to harm children when she, in fact, was seeking to protect her child. *The scant and costly resources available for mental healthcare for children likely places other parents in the same situation as this respondent. We can only look to our policymakers for a resolution to this conundrum. However, "culpability is not a prerequisite" for court intervention under MCL 712A.2(b)(2). In re Jacobs*, 433 Mich 24, 41; 444 NW2d 789 (1989). Respondent's admitted inability, not her unwillingness, to care for NRH's special needs with the level of assistance she was receiving, along with

her homelessness[3], rendered NRH's environment a place of danger for the seriously ill child and, thus, statutorily unfit. In this case, we are not left with a definite and firm conviction that the trial court was mistaken in finding statutory grounds to exercise jurisdiction over NRH. [*In re Hockett*, 339 Mich App at 255-256; emphasis added.]

Applying the rationale employed by this Court in *In re Hockett*, we conclude that the trial court erred when it declined to exercise jurisdiction over DVL under MCL 712A.2(b)(2). In this case, despite her efforts, respondent admitted that she could not care for DVL's special and significant mental health needs. She testified that DVL and her other two children would be at risk of harm if DVL were in the home. Testimony established that respondent refused DHHS's assistance in obtaining outpatient treatment, including in-home services. It is clear from the record that respondent had attempted years of outpatient therapy while DVL was living with her yet his behaviors continued to escalate. Even her attempts to have him placed in a year-long residential program that was intended to provide intensive mental health treatment ended prematurely because the residential program could not tolerate DVL's behavior. Yet the hospital and DHHS determined that DVL was safe to go home where he had threatened to harm his family, the home, his pets and himself.[4] A preponderance of the evidence supported a finding that respondent's actions rendered the home environment a place of danger for DVL, as well as respondent's other two children and, thus, statutorily unfit. See, *In re Hockett,* 339 Mich App at 256. Considering the record, we are left with a definite and firm conviction that the trial court erred when it failed to exercise jurisdiction over DVL under MCL 712A.2(b)(2).

Although the Court in *In re Hockett* found jurisdiction under MCL 712A.2(b)(2), it was reluctant to do so under MCL 712A.2(b)(1). A preponderance of the evidence in this case supports the assumption of jurisdiction under MCL 712A.2(b)(1), as well. *In re Hockett* did not involve a parent that *refused to cooperate in obtaining mental health services* for her child. The respondent mother in *Hockett*, like DVL's respondent mother, actually sought mental health services for her child. *In re Hockett*, 339 Mich App at 255-256. It is this salient fact that makes the Court's opinion in *In re Hockett* applicable to the present matter. Here, evidence presented at adjudication established that respondent refused to secure outpatient treatment for DVL—not because she refused to cooperate in obtaining mental health services for her son but because she had sought those services for years, DVL's behavior was escalating, and it was still unsafe for him to return home. During a July 13, 2021 team decision meeting, CPS offered respondent assistance in

---

[3] Unlike the mother in *Hockett*, respondent had housing for DVL but testified that her home was not safe for DVL, her other children, or herself when DVL resided there.

[4] How in the course of one day DVL could go from being nondischargeable to dischargeable from the hospital without receiving treatment casts doubt on whether the hospital chose to wash its hands of this troubled youth rather than keep him in a holding pattern while DHHS tried but failed to find a suitable placement for him. This circumstance likely occurs throughout the state of Michigan as beds in pediatric residential treatment facilities are few and far between.

securing outpatient mental health services for DVL after his discharge into her care.[5] DHHS also looked into a Community Mental Health referral that would have allowed DVL and respondent to receive services in the home.[6] Respondent, however, declined the offered services because her son required psychiatric care and "it wasn't safe for him to be in my care."

The trial court recognized the quandary that respondent faced:

That DVL has a very severe detachment disorder. It causes him to act out in very dangerous ways and that the mother has made numerous efforts to try to have DVL's condition addressed. . . . It doesn't matter what other circumstances she has to deal with, including the fact that she has two other children who would be at risk if she brought DVL home who is, as far as I can tell, that would be like bringing a ticking time bomb into your home. . . . It's her job to pick him up at the hospital even if it means that her other children are going to be abused because she's a single parent, and she has three children in one home. I don't know how anybody is supposed to manage that situation. That is beyond my comprehension. No one has explained that to me.

The trial court admitted it had never seen a case like this and the judge did not "see how I can find that she's been neglectful or abusive in terms of her actions to date and this is a very prickly problem." The court opined that a dependency petition could possibly be filed but it did not find respondent to be abusive or neglectful and denied to authorize the petition. Notably, the trial court as well as the Assistant Attorney General, the lawyer guardian ad litem and respondent's attorney all recognized that if the petition were not authorized, DVL needed to be picked up from his placement at the time (Hanley House); if respondent did not pick DVL up, DHHS would need to file another petition and the process would begin again. Respondent acknowledged that this was a "no-win situation" and she was facing a "Sophie's choice" because she loved DVL but they "exhausted everything the state has to offer, everything, and nothing has made a difference."

Based on this record, we are left with a definite and firm conviction that the trial court was mistaken in finding no statutory grounds to exercise jurisdiction over DVL. A preponderance of the evidence supports a finding that, despite recommendations made by an examining adult (not pediatric) psychiatrist, respondent, although able to do so, refused to pick him up from the hospital and failed to secure intensive outpatient treatment for her son. This was sufficient testimony to establish by a preponderance of the evidence that respondent refused to provide proper or

---

[5] Indeed, DHHS discussed with respondent the option of using an adoption subsidy to obtain a residential treatment program for DVL. How DHHS or respondent would pay for such a program was irrelevant as the record is devoid of evidence that there were open residential programs in Michigan but no funds to place DVL in a qualified residential treatment program. This also ignores the fact that respondent had already invested in an out-of-state residential treatment program and that program terminated DVL due to his unacceptable behavior.

[6] Again, there is no evidence in the record to establish that community mental health programs coming to the home weekly were sufficient to address DVL's extensive mental health challenges.

necessary care for DVL, who was subject to a substantial risk of harm to his mental well-being. MCL 712A.2(b)(1). *In re Hockett,* described respondent as well as NRH's parent when it found:

> This mother was unable to manage the complex mental health needs of her child. The [court] correctly determined that respondent declined to retrieve her child upon discharge. The [court] also correctly noted that respondent had the physical capacity to retrieve her minor child and did not do so. . . she, in fact, was seeking to protect her child. *In re Hockett*, 339 Mich App at 255.

Accordingly, we are left with a definite and firm conviction that a mistake has been made, and find that the trial court clearly erred when it failed to assume jurisdiction of DVL under MCL 712A.2(b)(1). *In re Long*, 326 Mich App 455, 460; 927 NW2d 724 (2018).[7]

Because the circuit court should have exercised jurisdiction over the minor child, we reverse the trial court's July 19, 2022 order finding no jurisdiction and dismissing the petition. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney

---

[7] We agree with the court in *In re Hockett*, 339 Mich App at 256, that "[w]e can only look to our policymakers for a resolution to this conundrum," i.e., providing services for the growing number of youth struggling with significant mental health issues in light of the "scant and costly resources available;" unless the Legislature addresses this crisis, more parent will be placed in the same unfortunate situation as the respondent here and in *Hockett*.