*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* TIMMONS/GOLLON, Minors.

UNPUBLISHED
March 14, 2024

No. 367659
Berrien Circuit Court
Family Division
LC No. 2021-000059-NA

Before: SWARTZLE, P.J., and REDFORD and YATES, JJ.

PER CURIAM.

Respondent-mother appeals of right the trial court's order terminating her parental rights to her two minor children, RT and WG, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), and (j) (reasonable likelihood that children will be harmed if returned to parent). Respondent-mother contends the trial court erred in finding that termination was in the children's best interests. We affirm.

## I. FACTUAL BACKGROUND

This case began after respondent-mother gave birth to her son, WG, on October 21, 2021. When he was born, WG tested positive for morphine, codeine, amphetamine, methamphetamine, and methadone metabolite. Respondent-mother admitted to the hospital staff that she had used methamphetamine, heroin, and opiates while she was pregnant with WG and that she had received limited prenatal care. WG went through withdrawal during his first few days in the hospital.

A Children's Protective Services (CPS) worker visited respondent-mother's house and saw cockroaches in the residence. Respondent-mother lived with her sister, Mandy Herrington, whose children were removed from her care due to extreme neglect. The CPS worker contacted a teacher, Michelle Horvatch, at Moccasin Elementary School where respondent-mother's nine-year-old son, RT, attended school. Horvatch commented that there were concerns about RT's reading level, his inability to focus, his failure to complete homework assignments, and his hygiene and body odor. RT and WG were both removed from respondent-mother's home and placed together with a foster family. After the Department of Health and Human Services (DHHS) took custody of the children, a foster-care worker found out that RT had seen respondent-mother and others taking drugs in the

-1-

home, and RT had been severely physically and emotionally abused by respondent-mother as well as her relatives and her boyfriend.

Respondent-mother enrolled in substance-abuse treatment and counseling at InterCare in Eau Claire and agreed to stop using illegal substances. Respondent-mother attended her parenting-time sessions, and the foster-care worker had no concerns about her parenting skills. Nevertheless, respondent-mother agreed to participate in a parenting class through the Berrien County Health Department. Respondent-mother also stated that she had had some prior involvement with CPS in 2012, but she did not remember the reason for that involvement.

On December 29, 2021, the trial court held a dispositional hearing at which the foster-care worker testified that respondent-mother had a negative drug test on December 20, 2021, but four or five other tests were positive for buprenorphine and fentanyl. Additionally, respondent-mother had good communication with the foster-care worker, she had not missed any parenting-time visits with her children, and she was employed as a home healthcare worker. On November 30, 2022, respondent-mother was terminated unsuccessfully from counseling services because she was not attending sessions and her therapist could not reach her. Respondent-mother also did not attend a hearing that day where the trial court ordered the DHHS to file a petition to terminate her parental rights. Those events followed a stream of positive drug tests and a drop-off in respondent-mother's attendance at parenting visits. Respondent-mother was absent for several months and RT became very depressed. Even RT's therapist encouraged termination to protect RT's mental health.

On March 29, 2023, the DHHS filed a petition to terminate respondent-mother's parental rights. That petition alleged respondent-mother had not found safe or suitable housing, she did not have a reliable source of income, and she did not submit to regular drug testing. On May 17, 2023, the trial court held a termination hearing. Then the trial court rendered its decision from the bench on June 28, 2023, finding that termination of respondent-mother's parental rights was warranted because, under MCL 712A.19b(3)(c)(i), 182 days or more elapsed since the initial dispositional order, and the court found, by clear and convincing evidence, that the conditions that led to the adjudication continued to exist and that there was no reasonable likelihood that the conditions would be rectified in a reasonable time given the ages of the children.

Despite efforts by petitioner, nonetheless, respondent-mother minimally and sporadically cooperated with the DHHS, failed to complete any goals successfully, and repeatedly tested positive for illegal drugs despite extensive services offered to her. The trial court also found that, under MCL 712A.19b(3)(j), respondent-mother failed to make the changes needed to be able to properly care for her children. The trial court found the children would be harmed if they were returned to respondent-mother's care because of her continued drug use, her instability, her lack of appropriate parenting skills, and because she showed no signs that those conditions would change.

Turning to the best interests of the children, the trial court found they needed permanency, consistency, stability, and a parent willing to take responsibility for providing for their needs, but respondent-mother was unable to provide that to them. Although she had a bond with the children, it was not significant enough to prevent termination of her parental rights. Consequently, the trial court found that termination of respondent-mother's parental rights was in the best interests of RT

-2-

and WG, so the trial court entered an order terminating respondent-mother's parental rights to RT and WG.  Respondent-mother now appeals.

## II.  LEGAL ANALYSIS

On appeal, respondent-mother does not contest the trial court's finding of statutory grounds to terminate her parental rights.  Based upon this and our review of the entire record, we conclude the trial court did not clearly err by finding that the unchallenged statutory grounds for termination were established by clear and convincing evidence.  Respondent-mother, however, asserts that the trial court clearly erred when it ruled that termination of her parental rights was in her children's best interests.  "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App 713, 733; 858 NW2d 143 (2014).  This Court reviews a trial court's decision that termination is in the best interests of a child for clear error.  *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022).  Clear error occurs "if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses."  *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

A trial court must find that termination is in the children's best interests before terminating parental rights.  *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012).  The trial court "should weigh all the evidence available to determine the children's best interests."  *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).  "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home."  *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted).  " 'If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made.' "  *Id*. at 42.

The record reflects that respondent-mother had a close, but unhealthy, bond with RT.  At the beginning of the case, RT had difficulty when he was away from respondent-mother because he worried about her well-being and felt responsible for her care.  The guardian ad litem expressed concerns about RT's apparent need to take care of his mother, but stated that, while in foster care, RT was "learning just to be a kid."  The record also reflects that RT was very concerned that WG would be abused by respondent-mother and those around her if WG was in her care without RT.  RT felt the need to protect WG from the same abuse he suffered.  Evidence showed that RT needed a home life with no surprises and instability or it would cause dysregulation and negative behavior.  That was a direct result of post-traumatic stress disorder that RT suffered from his home life with respondent-mother, which caused RT to also contemplate and attempt suicide while he was living in respondent-mother's care.  Until respondent-mother decided to no longer visit RT, he improved with the stable and consistent home life provided by his foster parents.  Evidence showed that he did better in school, made friends, and was involved in sports.  When respondent-mother stopped visiting, RT worried about respondent-mother and was preoccupied by his feeling that respondent-mother had abandoned him.

As the foster-care worker testified, respondent-mother had no understanding of the trauma RT suffered in her household, and she deflected and did not listen during his trauma assessment. Respondent-mother blamed RT for her drug relapse. Even after the trial court ordered petitioner to file a termination petition, respondent-mother expressed no interest in RT's well-being, she did not want to see the children, and she was more concerned about the care of her sister than the care of her children. Respondent-mother never spoke to RT's therapist, she shamed RT for telling CPS that he suffered abuse in her care, and she showed no insight into his needs or those of WG.

In addition to the negative bond between RT and respondent-mother, her bond with WG was tenuous at best. WG was born with drugs in his system because respondent-mother used drugs while she was pregnant with him. Records showed that WG needed to be treated for withdrawal symptoms caused by respondent-mother's drug use during pregnancy. Despite this, WG thrived and developed normally while in his foster home. Because respondent-mother voluntarily stopped seeing WG when he was 12 months old, any bond she had with him when he was a baby dissipated as he grew into an active toddler with his foster family.

In sum, the record reveals that respondent-mother had a negative impact on RT because of learned behaviors and traumatic abuse that he suffered while respondent-mother was using drugs. Respondent-mother also gave WG a challenging start in life by using drugs while she was pregnant with him. Respondent-mother continued to use drugs and chose to remain in a dysfunctional home with relatives who had a history of abuse, neglect, and drug use. RT and WG obtained the stability and consistency they needed in their foster home, and they both showed significant improvements as a result of their placement with their foster parents. Therefore, the trial court did not clearly err by finding that it was in the best interests of the children to terminate respondent-mother's parental rights.

Affirmed.

/s/ Brock A. Swartzle
/s/ James Robert Redford
/s/ Christopher P. Yates

-4-