*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PETERSON, Minors.

UNPUBLISHED
April 18, 2024

Nos. 366907; 366976
Branch Circuit Court
Family Division
LC No. 22-006436-NA

Before: BOONSTRA, P.J., and FEENEY and YOUNG, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-father and respondent-mother appeal as of right the trial court order terminating their parental rights to the minor children, EP, DP, JP, and MP, under MCL 712A.19b(3)(c)(*i*) (conditions that led to the adjudication continue to exist), MCL 712A.19b(3)(g) (failure to provide proper care or custody), and MCL 712A.19b(3)(j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. FACTS AND PROCEEDINGS

The Department of Health and Human Services (DHHS) received a complaint in March 2022 after the oldest child, EP, was seen at a hospital for excessive vomiting, and medical staff determined that he was malnourished and also suspected gross neglect. When DHHS went to respondents' rental home, they found that there was no heat in the house and that respondents had not had hot water for several weeks. The house was also littered with piles of trash, beer cans, liquor bottles, cigarette butts, urine, and feces. Respondent-father and respondent-mother kept animal kennels in the kitchen that were full of urine and feces, and the refrigerator contained moldy and spilled food. The shower in the house also contained garbage, a mop, dirty diapers, and feces.

DHHS tried to work with respondent-father and respondent-mother to encourage them to clean the house. In May 2022, a DHHS employee went to the home and saw no improvement in the conditions and also saw that EP, DP, and JP were covered in rashes that respondents did not

---

[1] *In re Peterson Minors*, unpublished order of the Court of Appeals, entered July 25, 2023 (Docket Nos. 366907 and 366976).

treat.  In June 2022, DHHS filed a petition describing these and other deplorable conditions and further alleged that the children did not see doctors, did not receive regular vaccinations, and did not have any dental care.  The petition further alleged that the oldest child, who was five years old, could not speak and communicated with grunting noises, he was not potty trained, and he was not enrolled in any educational programs.

DHHS did not request removal of the children from the custody of respondents until respondent-mother refused a DHHS employee access to part of the home and then lunged at the worker when the employee tried to take photos of the house and one of the children, JP.  Respondent-mother was ultimately arrested when she physically fought with police officers at the scene.  The children were placed with their paternal grandmother, but they were later moved to the care of a maternal aunt after the grandmother scratched EP's arms as a punishment and, in doing so, drew blood and left numerous abrasions on the EP's arms.  At about the same time, EP sustained a serious burn on a propane heater that the grandmother had agreed to remove from the house or put a barrier around but did not.  During the investigation, DHHS discovered that the grandmother's parental rights were terminated to, or she otherwise lost custody of, eight other children because of abuse and neglect.

Respondent-mother gave birth to the youngest child, MP, and that child was removed from respondent-mother's care because of the allegations in the petition involving the other children.  She also failed to interact with the baby while in the hospital and expected others to feed and clean the baby. At that time, respondent-mother admitted that the house was not clean enough yet for the children to return to the home.  Evidence also showed that respondent-mother's parental rights were terminated to three other children in 2017 because of neglect and failure to provide those children safe and suitable housing.  When respondents could not get necessary repairs on their rental home, and when they were about to be evicted, they decided to move in with the same paternal grandmother and her husband who abused EP.[2]  Even though the DHHS made clear that the children would not be returned to the parents if they lived with the paternal grandmother, respondent-father and respondent-mother nonetheless planned to keep the children in the upstairs bedrooms of the grandmother's house, although they would need to share a bathroom, kitchen, and living room with the grandmother as well as three other family members who also lived in the home.

In April 2023, petitioner filed a petition to terminate both respondent-father and respondent-mother's parental rights.  After a two-day termination hearing, the trial court entered an order terminating their parental rights in June 2023.

Both respondents now appeal.

---

[2] The paternal grandfather hit EP with a belt and respondents knew about it but respondent-mother believed he was "playfully" hitting EP with the belt because EP did not cry, so she did not tell DHHS about the incident.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent-father and respondent-mother both argue that clear and convincing evidence did not support the trial court's finding of statutory grounds for termination. We disagree.

We review "for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, 341 Mich App 332, 343; 990 NW2d 685 (2022). Clear error occurs "if the reviewing court has a definite and firm conviction that a mistake has been committed . . . ." *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). "When applying the clear-error standard in parental termination cases, 'regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.' " *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

Although respondent-father only cites two statutory sections, MCL 712A.19b(3)(c)(*i*) and (g), in arguing that the trial court lacked clear and convincing evidence to find grounds for termination, the trial court ruled that petitioner presented clear and convincing evidence to terminate respondent-father's parental rights to the children under three statutory sections: MCL 712A.19b(3)(c)(*i*), (g), and (j). Termination of parental rights needs only to be supported by a single statutory ground. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009). As such, we may presume that the trial court did not clearly err by finding that the unchallenged statutory ground, MCL 712A.19b(3)(j), was established by clear and convincing evidence. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000). Therefore, respondent-father's failure to challenge subsection (3)(j) constitutes a waiver of his challenge to the trial court's finding that statutory grounds existed to support termination. Nevertheless, as will be discussed, for many of the same reasons supporting the trial court's finding that statutory grounds existed to support termination of respondent-mother's parental rights, the trial court also did not clearly err by finding that statutory grounds existed to support termination of respondent-father's parental rights.

Respondent-father and respondent-mother argue that the record did not contain clear and convincing evidence that, after 182 days, the conditions that led to the adjudication continued to exist and that there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering the ages of the children. See MCL 712A.19b(3)(c)(*i*). We disagree.

At the beginning of the case, respondent-father and respondent-mother lacked suitable housing, and the same remained true at the time of the termination hearing. After the children were removed from their care, respondent-father was able to restore heat and water to the home but the dirty conditions went unremedied, and their landlord refused to enter the home to make other repairs due to the condition of the home. Both respondent-father and respondent-mother knew that, after the paternal grandmother physically harmed EP and he was hit with a belt and burned on a dangerous heating element that should not have been in the house, DHHS would not consider the grandmother's home safe or appropriate for the children. The parents chose to move into the grandmother's house despite DHHS' admonition that the children could not be returned to the paternal grandparents' home due to physical abuse, prior terminations, and unsafe conditions where the children were allowed to play. They needed to install drywall and flooring in the upstairs bedrooms, but, when the foster-care worker asked to see the space that they made for the children

the day before the termination petition would be filed, respondent-father and respondent-mother did not allow her to see the rooms. Respondent-father admitted that the rooms were not ready or safe for the children.

During the proceedings, respondent-father agreed to obtain some form of long-term employment because a lack of food led to the children's malnourishment as well as their food-binging and hoarding behaviors. Respondent-father claimed to have applied for numerous jobs through an employment agency, but when the foster-care worker checked, she found that he applied for two jobs in December 2022, and two jobs in January 2023, but he did not have the qualifications for any of them. Respondent-father worked at four different jobs during the pendency of the case, but the longest he held a job by the first termination hearing was three weeks.

Respondent-mother claimed that she worked in the past but that she needed to receive disability income because she had low iron and mental-health problems. Contrary to respondent-mother's claim, however, her therapist did not diagnose her with anything that would prevent her from working. Instead, he recommended that she get a psychiatric evaluation for her disability claim, but respondent-mother refused to do so. Respondent-mother also testified at the termination hearing that she did not remember ever receiving a doctor's diagnosis of a physical problem that prevented her from working. Possibly for that reason, respondent-mother was denied disability income several times in the past, and she received another denial on the first day of the termination hearing. Therefore, by the termination hearing, neither respondent had a source of income or other resources to support themselves, much less a family of six people.

With respect to the conditions that led to the adjudication continuing to exist, respondents continued to neglect or ignore the children's emotional, physical and educational needs. Testimony revealed that even when EP received his "first start" for positive behavior at school and asked respondent-mother if she was proud of him, she merely walked away. Respondent-mother did not support DP and JP participating with Early On services even though their trauma assessments, hoarding behaviors, and outward aggressiveness indicated that they would benefit from these services as they were too young for therapy. Respondent-father tended to follow respondent-mother's lead on these issues. They did not inform DHHS of paternal grandmother's prior terminations when DHHS first planned to place the children with her, and then did not reveal the abuse that they learned was occurring in paternal grandmother's house when it happened (i.e., when the grandmother scratched EP as punishment for him scratching MP and when the grandfather hit EP with a belt). During visits, respondents would hold MP but did not call her by name or interact with her to develop a strong bond with the baby; in the hospital, respondent-mother had others feed and clean up the baby. Whether putting off EP's original follow-up medical appointment after his emergency room visit in March 2022 or finally reapplying for disability benefits in April 2023, respondent-mother's ability to take care of important issues in a timely manner remained unresolved. And both respondents delayed significantly in participating with counseling.[3] Clearly, the conditions that led to the adjudication continued to exist and there was

---

[3] Notably, the trial court ordered the parties to submit to psychological evaluations but they never occurred and, in its bench opinion, the trial court stated it had no idea why they were not completed. The court did, however, reference respondent-mother's previous 2014 psychological evaluation

no reasonable likelihood, given that this was respondent-mother's second time being involved with services and facing the termination of parental rights, that they would be rectified within a reasonable time given the young ages of these children. MCL 712A.19b(3)(c)(i).

Moreover, a parent's failure to provide adequate housing and financial support for a minor child constitutes clear and convincing evidence that termination is appropriate. *In re Frey*, 297 Mich App 242, 244; 824 NW2d 569 (2012). Clear and convincing evidence showed that respondent-father and respondent-mother lacked safe and suitable housing and respondent-father was financially able to provide care for these children but they lacked the resources to feed, clothe, and properly care for the children. MCL 712A.19b(3)(g). Again, because petitioner is required to prove only one statutory ground for termination, we need not consider whether the trial court properly terminated respondents' rights under other statutory sections. See *In re Olive/Metts*, 297 Mich App 35, 41; 823 NW2d 144 (2012).

## III. BEST INTERESTS OF THE CHILDREN

Respondent-father and respondent-mother further argue that the trial court erred when it terminated their parental rights because petitioner failed to show by a preponderance of evidence that termination was in the best interests of the children. We again disagree.

This Court reviews for clear error a trial court's finding that termination of parental rights was in the best interests of the children. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009). "Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App at 733. In its best-interest determination, the trial court should consider a variety of factors that may include "the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Mota*, 334 Mich App at 321 (quotation marks and citation omitted). The trial court may also consider "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. (quotation marks and citation omitted). A trial court may also consider how long the child has lived in foster care or with relatives and the likelihood that "the child could be returned to [the] parent's home within the foreseeable future, if at all." *In re Frey*, 297 Mich App at 248-249. Further, under MCL 712A.19b(5), "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall

---

from the prior child protective case that resulted in the termination of her rights to three other children. Caution should be used when relying on a psychological evaluation that is not current. While her own testimony—without confirmation—could lead to the conclusion that respondent-mother suffered a brain injury as a child and had a learning disability, no one argued that the respondents were entitled to additional services consistent with *In re Hicks-Brown*, 500 Mich 79, 85-88; 893 NW2d 637 (2017).

order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made."

We note that respondent-father has failed to properly present this issue on appeal because he does not explain what factors or evidence the trial court should have considered or weighed in his favor at the termination hearing, and instead asserts that, because he felt that he had a bond with the children and he now has a steady job, the trial court's ruling should be reversed. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority." *In re Warshefski*, 331 Mich App 83, 87; 951 NW2d 90 (2020) (quotation marks and citation omitted).

Nevertheless, we hold that ample evidence established that termination of respondent-father's parental rights was in the best interests of EP, DP, JP, and MP. For several months after the petition was filed, respondent-father failed to clean up the filth in the home. Although he blamed the landlord for failing to fix some problems, the record reflects that no workers would enter the house to make repairs because of the deplorable conditions inside. As discussed, once respondent-father moved into the paternal grandmother's house, he chose to live with someone who deliberately harmed one of his children, and, therefore, he failed to understand or concern himself with the risk of harm to the children if they were returned to his care.

DHHS also intervened because, by age five, EP could not speak, he was not potty trained, and he lacked developmentally appropriate skills, as did DP and JP. The children also exhibited alarming and violent behaviors, such as running into traffic, food binging and hoarding,[4] stealing food from other children, throwing objects and chairs at people, and spitting on people. Despite evidence that the children showed signs of food being unavailable or withheld from them and that malnourishment resulted in rotten teeth, respondent-father did not seem concerned when he would lose a job after only a short time working. He did not show any understanding that, without a regular income or other resources, the children would again go hungry if returned to his care.

Further, at parenting time, the foster-care worker noted that respondent-father had a hard time engaging with the children or keeping them engaged once he had their attention. The foster-care worker also noted that respondent-father had a short temper with the children and became easily frustrated with them.[5] Respondent-father participated in services in a perfunctory way, but

---

[4] The children's maternal aunt, Ms. McFarland, who took placement of the children after they left the grandparents' home, testified that the young children would get up in the middle of the night and eat anything they could find including a jar of garlic and a 2 lb meatloaf. They would also break locks off cabinets to get to the food. EP and MP remained with McFarland but respondent-mother's harassment of her sister led to McFarland requesting that DP and JP be removed from her home. The trial court did note that it considered this relative placement when determining the children's best interests, but it found that termination was still in their best interests.

[5] This would occur most when respondent-mother would sit and instruct respondent-father on what to do during their parenting time rather than engage with the children herself. She would hold the

he only began services months after he agreed to engage in them, and he could not name one thing that he learned during parenting classes. Evidence also showed that respondent-father asked to leave parenting time early, and when a relative supervised parenting time, she saw respondent-father hit the children. EP and DP also told the foster-care worker that respondent-father hit them. Although respondent-father seemed to do better when a supportive visitation worker helped with parenting time, EP still reported that respondent-father hit the girls or yanked them by the arms at those parenting-time visits.

Indeed, the trial court stopped parenting time because, although the children's behaviors improved after they were removed from respondent-father and respondent-mother's custody, they regressed on days when the children would visit with them and after the visits. On one occasion, EP threw himself on the ground and refused to get on the school bus at the end of the day because he did not want to go to parenting time. As the trial court found, it was only because of DHHS' involvement that EP was receiving the intensive psychological services that he needed when the parents failed to provide even the most basic medical and dental care to the children. We find no error in the trial court's ruling that termination of respondent-father's parental rights was in the best interests of the children.

We also hold that the trial court did not err by finding that a preponderance of evidence showed that termination of respondent-mother's parental rights was in the best interests of the children. Like respondent-father, respondent-mother never adequately cleaned the rental home for any length of time, even though respondent-mother's parental rights were terminated in 2017 to three other children because her living conditions were not appropriate or safe. Nonetheless, at the termination hearing, respondent-mother denied that the rental home was unclean, despite overwhelming evidence to the contrary, including her own prior admissions. Respondent-mother testified that the house was in disarray because two toddlers, DP and JP, made a mess before she could clean it up and it happened to fall on a day when the foster-care worker visited. Respondent-mother insisted at the termination hearing that she cleaned the house and animal kennels every morning and that the home was completely clean as soon as the children were removed. As the foster-care worker observed, and the trial court summarized, toddlers simply could not create the piles of trash, excrement, cigarette butts, and beer cans throughout the home.

As with respondent-father, respondent-mother only started services months after she agreed to begin parenting classes and mental-health counseling. Despite the fact that the children were malnourished, never went to a doctor, harmed themselves and others, and lacked age-appropriate skills, respondent-mother testified at the termination hearing that she was already doing virtually everything they taught in parenting classes and that she, therefore, did not learn much from them. She clearly did not benefit from services because she repeatedly blamed others for circumstances in the home and denied that the children had any significant problems while in her care.

Further, throughout the case, foster-care and Court Appointed Special Advocate workers were concerned about the lack of bond between respondent-mother and the children. Evidence

---

baby MP but would not interact with her, call her by name, or check to see if she needed a diaper change.

showed that respondent-mother often ignored the children when they sought her attention, she left parenting times early, and she failed to interact with the children unless instructed to do so or heavily supervised. The children's behaviors improved after they were removed from respondent-mother's custody and received the medical, psychological, and educational services they needed, but the children regressed on days when they had parenting time with respondent-mother and after parenting time. On the basis of this evidence, the trial court did not clearly err by finding that termination of respondent-mother's parental rights was in the best interests of the children.

Affirmed.

/s/ Mark T. Boonstra
/s/ Kathleen A. Feeney
/s/ Adrienne N. Young