*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GUY, Minors.

UNPUBLISHED
January 13, 2026
1:21 PM

No. 372624
Wayne Circuit Court
Family Division
LC No. 2022-000019-NA

Before: BOONSTRA, P.J., and O'BRIEN and YOUNG, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's order terminating his parental rights to his minor children, KJG1, KRG, and KJG2,[1] under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), (k)(*iii*), and k(*iv*).[2] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On December 11, 2021, respondent-father called emergency medical services because KJG2, approximately four months old at the time, had stopped breathing. At the time, respondent-father lived with respondent-mother and the three children in his father's (the children's paternal grandfather) house. Respondent-father was one of the primary caretakers of the children. KJG2 was taken to the hospital. While there, medical personnel discovered that KJG2 had fluid buildup and bleeding on both sides of his brain, a ligament injury in his neck, bleeding in the backs of his eyes, posterior fractures to four ribs, a mostly healed fracture to his left wrist, Covid-19, and pneumonia. He also met the criteria for severe malnutrition. Because KJG2 had tested positive for Covid-19, KRG was also examined. KRG had multiple rib fractures in different stages of

---

[1] KRG and KJG2 are twins.

[2] The children's mother was also a respondent in the proceedings below, and her parental rights to the three children were also terminated; however, she is not a party to this appeal.

healing, two healing fractures to his right arm, and fractures on both sides of his clavicle. KJG1, approximately two years old at the time, was examined and found to have no injuries.

Respondent-father told the hospital's "child at risk evaluation team" that he had administered cardiopulmonary resuscitation to KJG2 when he stopped breathing. Further, the twins had been born prematurely, and respondent-father told the evaluation team that they had been born with "soft bones." Respondent-mother told the team that the twins were born with a liver condition that may have weakened their bones. Dr. Bradley Norat, the medical director of the child at risk evaluation team, determined that respondents' explanations were inconsistent with the injuries that KJG2 and KRG had suffered, and found that the twins' injuries were the result of nonaccidental trauma, which indicated physical abuse. Respondent-father denied causing any physical injury to the twins.

In January 2022, the Department of Health and Human Services (DHHS or petitioner) filed a petition to terminate respondents' parental rights to all three children, noting that there was a pending criminal investigation into respondents' possible child abuse. The trial court authorized the petition and ordered that the children be removed from respondents' home. KJG2 was placed in a separate foster home from KJG1 and KRG because of his medical needs. KJG1 had been diagnosed with post-traumatic stress disorder (PTSD) and was in weekly therapy. KRG was diagnosed with epilepsy, a traumatic brain injury, and a mental delay. While in foster care, KRG had regular neurology appointments, attended Early On, a free early intervention system for infants and toddlers, had biweekly special education through Early On, would have an individualized education program (IEP) once in school, received physical therapy and occupational therapy, and was scheduled to start speech therapy and feeding therapy. He had medical appointments three to four times per week. KJG1 and KRG were taken to all of their appointments and received appropriate care from their foster parents.

KJG2 had a traumatic brain injury, visual impairments, developmental delays, a seizure disorder, and cerebral palsy. He was nonverbal, immobile, and had a feeding tube. KJG2 saw a neurologist, a vision specialist, a physical therapist, an occupational therapist, a speech therapist, and a feeding specialist. He took approximately 14 medications on a daily basis. He typically had five to 10 medical appointments per week. His foster parents received ongoing education and training on how to meet his needs. The children were in foster care for almost two years and did not suffer from any more broken bones during this time.

At some point between January and April 2022, respondent-father was incarcerated in Michigan for retail fraud. He was extradited to Texas in April 2022, for a probation violation. In 2018, respondent-father had received five years deferred probation for an aggravated robbery charge in Texas. Respondent-father attended a pretrial hearing in May 2023 via teleconferencing software, and stated that he was still incarcerated in Texas; respondent-father stated that his release date was November 16, 2027, but he would become eligible for parole in November 2024. Respondent-father planned to return to Michigan once he was released on parole. However, the release and move would have to be approved by the state of Texas. He would be on parole for three years. Respondent-father had not seen his children since their removal in December 2021.

The termination hearing began in December 2023; it continued in June 2024 due to various issues, including respondent-mother also being incarcerated in Texas. At the termination hearing,

Dr. Norat testified that he had diagnosed KJG2 and KRG as suffering from nonaccidental trauma causing injury. A Children's Protective Services (CPS) investigator testified that she had concluded after an investigation that KJG2 and KRG had been abused and that termination of respondents' parental rights was necessary to ensure their well-being. Respondent-father denied causing, or even being aware of, the majority of twins' injuries, stating that KJG2 had stopped breathing in December 2021 "out of the blue." Respondent-father suggested that COVID-19 and the twins' birth conditions could have caused their injuries.

The trial court found statutory grounds to terminate respondent-father's parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), (k)(*iii*), and (k)(*iv*). The trial court also found that termination of respondent-father's parental rights was in the children's best interests, and terminated his parental rights as described. This appeal followed.

Respondent-father argues that termination of his parental rights was not in his children's best interests. We disagree.

## II. STANDARD OF REVIEW

This Court reviews for clear error a trial court's findings that there are statutory grounds to terminate parental rights and that termination is in a child's best interests. *In re White*, 303 Mich App 701, 709, 713; 846 NW2d 61 (2014). Factual findings are clearly erroneous when this Court has a firm and definite conviction that a mistake has been made. *Id*. at 709-710.

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent-father argues that the trial court clearly erred by terminating his parental rights to his three children. We disagree. Before terminating a respondent's parental rights, the trial court must find by clear and convincing evidence that at least one statutory ground for termination of parental rights exists. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013).

In his brief on appeal, respondent-father makes no specific argument regarding the trial court's determination that the statutory grounds for termination under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), (k)(*iii*), and k(*iv*) had been proven by clear and convincing evidence. Respondent-father merely recites general caselaw concerning parent's rights to their children and asserts that "[n]o evidence was presented that [respondent-father] had abused or neglected his children," because others had access to the children in the home, KJG1 had no injuries, and respondent-father had been the one to call emergency services when KJG2 stopped breathing. Respondent-father also suggests, without elaboration or evidence, that Dr. Norat did not sufficiently review the twins' birth records before making his diagnosis. Respondent-father's arguments on this issue are so woefully underdeveloped that we could deem them abandoned. See *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019).

In any event, the trial court concluded that respondent-father had abused the children directly or failed to protect them from severe abuse, and this conclusion is supported by the record, notwithstanding that other adults were present in the home. MCL 712A.19b(3)(b)(*i*) and (b)(*ii*) permits a trial court to terminate a respondent's parent rights when:

The child or a sibling of the child has suffered a physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home. [MCL 712A.19b(3)(b)(*i*)-(*ii*).]

"[F]or [a] physical injury to fall within MCL 712A.19b(3), it must be caused by a 'parent's act' or a 'nonparent adult's act' and not merely contributed to by an unintentional omission." *In re LaFrance*, 306 Mich App 713, 725; 858 NW2d 143 (2014). "[S]ubparagraph (*ii*) is intended to address the parent who, while not the abuser, failed to protect the child from the other parent or nonparent adult who is an abuser." *Id*. How a parent treats one child is probative of how they may treat their other children. *In re HRC*, 286 Mich App 444, 460-461; 781 NW2d 105 (2009).

Contrary to respondent-father's cursory argument, the record overwhelmingly supports the conclusion that two of the three minor children in respondents' home suffered severe, repeated physical abuse and injury. *White*, 303 Mich App at 709. Although respondents both denied causing the injuries, they had no explanation for how many of the injuries had occurred, much less why some of the injuries went unreported for months and were only discovered after KJG2 required lifesaving medical intervention. Under these circumstances, the trial court could conclude that respondent-father's parental rights could be terminated either under (b)(*i*) if he was the abuser, or (b)(*ii*) if, despite being a primary caretaker for the children, he failed to prevent their abuse. Having determined that the trial court correctly found at least one ground for termination to have been proven by clear and convincing evidence, we need not address the trial court's findings regarding the other grounds for termination.

## IV. BEST-INTEREST DETERMINATION

Respondent-father also argues that the trial court erred by finding that termination of his parental rights was in the children's best interests. We disagree.

A best-interest analysis focuses on the child, not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). When determining if termination is in a child's best interests, the trial court may consider the bond between the child and the respondent, the respondent's parenting ability, the child's need for stability and permanency, and the advantages of the child's current placement over their parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The trial court may also consider any history of domestic violence, the respondent's compliance with their parent-agency agreement, the respondent's visitation history with the child, the child's well-being in their current placement, and the potential for adoption. *White*, 303 Mich App at 714.

In this case, the trial court did not err when it determined that termination of respondent-father's parental rights was in the children's best interests. The bond between respondent-father and the children was minimal. *Olive/Metts*, 297 Mich App at 42. Respondent-father had been incarcerated for the majority of the twins' lives, and had not seen his children since December 2021. KJG1 referred to his foster father as his father. Though respondent-father believed that the children would recognize him, this is doubtful given the young ages of the children and their lack of contact with respondent-father. Additionally, the twins had been severely physically abused while respondent-father was one of their primary caretakers, and at least one child had also suffered from severe malnutrition. From the record before this Court, termination of respondent-father's parental rights was not only in the children's best interests, but in all likelihood necessary to save their lives.

The record shows that the children are all young and need stability and permanency. *Id*. Further, the twins have substantial medical needs and their foster care placements had undergone training in order to properly care for them. The children are bonded with their foster parents. Though respondent-father claimed he would learn how to address the medical needs of the twins, he had not made any effort to learn about the extent of their injuries or what their care would require. The twins have an extensive number of medical appointments each week and need specialized care when at home. The current foster parents of the children have met their needs and demonstrated a willingness to learn more as needed to continue to meet the needs of the children.

In this case, respondent-father was never given a parent-agency agreement or case service plan because petitioner requested termination of respondent-father's parental rights on the basis of serious physical abuse. See MCL 712A.19a(2); MCL 722.638(1)(a). Similarly, respondent-father did not have a history of parenting time. . *Id*. Because there was no parent-agency agreement or parenting time that occurred in this case, these factors do not influence the best-interest determination. The children were all doing well in their foster care placements and their needs were met. *Id*. The foster parents of KJG1 and KRG were interested in adopting them, and the adult daughter of KJG2's foster parents was interested in adopting him. *Id*. Given the severe physical abuse suffered by the twins, the children's lack of contact with respondent-father, the medical needs of the twins, and the fact that the children were in stable foster homes that met their needs, the trial court did not clearly err when it determined that termination of respondent-father's parental rights was in the best interests of the children.

Affirmed.

/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien
/s/ Adrienne N. Young

-5-